THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* WALTER LEROY LEE, Respondent.

Fourth Department, February 19, 1970.

*Jack B. Lazarus, District Attorney* (*Raymond E. Cornelius* of counsel), for appellant.

*Thomas G. Presutti* and *Charles F. Crimi* for respondent.

WITMER, J. This appeal by the District Attorney of Monroe County presents in an unusual factual setting the question of whether defendant was in custody or under restraint when he made statements to the police, and hence whether the County Court was correct in suppressing such statements after a preliminary trial of the issue. The state of the law on this subject requires a careful analysis of the circumstances under which the statements were made.

On April 9, 1968 at 1:40 A.M. Officer Barnes of the City of Rochester Police Patrol Squad was in his police automobile as it stood on Joseph Avenue when he heard what sounded to him like gun shots. Immediately he drove southerly on said avenue to the Morris Street intersection, where the defendant "flagged" him. The officer stopped, opened his righthand door and defendant got in. The officer testified that defendant said that a man with a weapon had attempted to rob him, and defendant shot him in self defense. Defendant testified that he told the officer that he had been in a fight, during which he shot a man. The officer asked defendant for his gun, which was handed over; and the officer opened it and removed five spent shells. He asked defendant for his gun permit, and defendant handed that to him.

The Trial Judge correctly ruled that the foregoing voluntary statements were admissible, and that it was proper for the officer to seize the gun as a safety measure (see *People* v. *Marsh,* 20 N Y 2d 98, 101). However, the Judge further ruled that all subsequent statements and acts by the defendant in the presence of the police, to be presently related, must be suppressed, and it is from his order of suppression that the District Attorney appeals.

It is interesting to note that in making his ruling the Judge stated that, "there is no question but that the statements made by this defendant to the police were all voluntary so that if we were dealing solely with the voluntariness of the statement(s), all of them would be admissible". Clearly, the Judge was distinguishing between voluntariness in fact and voluntariness in law. He further stated that defendant's statement to the police that, "I shot a man in self defense", "does not sound like a complaint to me"; that "The sole question * * * is when was this defendant entitled to be advised" of his *Miranda* rights; that there was no question that the police were speaking to the man who would be the defendant, "if there was to be one"; that clearly a crime had been committed, and defendant was asserting self defense to avoid responsibility for it; and hence that defendant was entitled to be given the *Miranda* warnings.

Officer Barnes testified that as soon as defendant made the above statement to him he radioed to police headquarters for help, and reported that he had "the victim. I cannot locate the suspect", and he testified that he so reported because of defendant's claim of attempted robbery.

Officers Cooper and Torrelli came in response to Barnes' call. Barnes had not arrested defendant or placed him in custody; and he turned him over to the other officers when they arrived.

Officer Cooper asked defendant to get into his police car so they could get a report of what had occurred, and defendant got in. The officer said that he did not then arrest defendant. Defendant testified that he answered the officer's questions as to what had happened, of his own free will, as a complainant, thinking it his duty to speak. Officer Cooper testified that defendant at first said that a man tried to rob him, but defendant insists that he told Cooper that he had been in a fight and shot a man in self defense. Cooper testified that at first defendant said that he was a good shot, that he shot five times, but did not know whether he had hit his assailant; and that shortly after, defendant said that he had not hit him.

The officers drove defendant one block west on Morris Street to Clinton Avenue, and had defendant (who remained in the automobile) point out where he stood when he fired the shots. This was outside of La Villa's tavern. Cooper then went into the tavern while Officer Torrelli remained in the car with defendant. Cooper testified that in the tavern he talked with the proprietor who told him that there had been a fight and that the shooting was not in self defense; and that when Cooper came out of the tavern, defendant changed his story to say that he

had been in a fight with a man who drew a knife, and then defendant shot him in self defense.

Through the car radio the officers and defendant then heard that a man who had been shot was in the Genesee Hospital. Cooper testified that he said, "We'll go. Will you go to the Genesee Hospital with us?", but did not testify that he waited for a reply. Defendant testified that one of the officers said that a man is reported shot in the leg and added, "let's get right over there", and they drove to the hospital with him.

On arrival at the hospital both officers Cooper and Torrelli entered with the defendant. Three men (who, it developed, had taken the shooting victim, Taylor, to the hospital) were standing in the waiting room and they and defendant spoke to each other. Officer Cooper testified that he was then confident that the wounded man at the hospital was the one whom defendant had shot. Defendant was left alone in the waiting room while officer Cooper went into the emergency room to see the victim, Taylor, and officer Torrelli talked with the three men who brought Taylor to the hospital. Defendant was not under arrest.

Officer Barnes also drove to the hospital, and on entering the waiting room he found defendant sitting alone there, and Barnes sat next to him. At one point defendant went to the lavatory, and Barnes accompanied him there as far as the door, but he did not enter; and when defendant came out they returned to sit and wait for Cooper and Torrelli. Defendant testified that Barnes was acting like a guard, and also tried to get defendant to sign a statement but he refused. Barnes denied these assertions.

In the emergency room the doctors were about to dress Taylor's leg wound, and they permitted Cooper to talk to him. Taylor told Cooper that he had been in a fight and some "cat" had fired at him, but Taylor did not know who it was; and he was reluctant to talk about it. Cooper testified that he then suspected that "all parties were lying". He told Taylor that he had a man he would like Taylor to look at, and invited defendant into the room. Defendant asked to talk to Taylor alone, and officer Cooper left. When defendant came out of the room Cooper re-entered and spoke to Taylor who said that defendant was the man who shot him. Until this time defendant had not been arrested; and the officers testified that had he decided to leave at any time, they would have permitted him to go; and they further said that no force, threats, or promises were made to defendant at any time. On returning to the waiting room Cooper placed defendant under arrest and gave to him the stand-

ard warnings of his rights, reading them from a card. No question is presented with respect to conversations after such warning.

The victim, Taylor, testified that when defendant talked with him in the emergency room, " I told him he told on himself, because I wouldn't have said anything about it "; and added that defendant agreed to pay Taylor's bills.

Officer Cooper testified that from the moment defendant said that he had shot a man he was a suspect; but he was not arrested because the police lacked sufficient information, that is, to prove that a man indeed was shot by defendant, and under what circumstances.

Defendant contends that the evidence shows that he was the target of police investigation of the shooting right from the start, and that hence all of his statements after surrendering the gun were properly suppressed (see *People* v. *Oramus*, 25 N Y 2d 825).

On the other hand, the District Attorney urges that there was no occasion for giving the *Miranda* warnings in this case before defendant's actual arrest, because the defendant came to the police to complain of an attempted robbery and assault upon him and he was seeking police aid; that the police were entitled to accept his complaint at face value and investigate the matter, including interrogation of him until they were convinced that his story was false; and that defendant was not in the role of an accused person—he spoke freely as a complaining witness, without any compulsion *and without knowing the subjective thoughts of the police.*

The District Attorney contends that the Trial Judge improperly relied upon *Escobedo* v. *Illinois* (378 U. S. 478) and the principle that once a person is the target of an investigation he is entitled to warning; that in *Miranda* v. *Arizona* (384 U. S. 436) the United States Supreme Court made more definite the rights and duties of defendants and the police by setting forth specific standards of conduct; and that a suspect is entitled to the warnings only when he " has been taken into custody or otherwise deprived of his freedom of action in any significant way " (*Miranda, supra,* p. 444; and see *People* v. *Rodney P.* [*Anonymous*], 21 N Y 2d 1, 7).

In applying that test to the facts of this case we conclude that defendant's rights were not violated. The police did not pick him up—he " flagged " them and voluntarily got into their car. At the hospital waiting room he sat unattended until officer Barnes arrived and seated himself next to him, and so up to

this point defendant was under no restraint in any way. He testified that he made his statements to the police voluntarily, and the Trial Judge so found.

In *People* v. *Rodney P.* (*Anonymous*) (*supra*, pp. 8–9) the court held that in cases where it is difficult to determine whether one has in fact been deprived of his freedom, the subjective mind of the police in their investigation is not determinative — the question is whether the suspect reasonably believes that his freedom of action or movement is significantly restricted by the interrogation. This test has recently been reaffirmed in *People* v. *Yukl* (25 N Y 2d 585); and see *People* v. *McKie* (25 N Y 2d 19, 27–29); and *People* v. *Phinney* (22 N Y 2d 288, 291). "The test * * * is not solely dependent either on the self-serving declarations of the police officers or the defendant" (*Rodney P., supra*, p. 9) — "not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position." (*People* v. *Yukl, supra*, p. 589.) Here we do not even need to rely upon what a reasonable person in defendant's position would have thought, for we have it from defendant's own mouth that he spoke freely without any compulsion or restraint — showing his own subjective attitude.

" The fact that he [the suspect] might have been restrained, had he attempted to leave, is not controlling ". (*Rodney P., supra*, p. 10.) Thus, we need not speculate upon the truth of the officers' conclusory statements that defendant was not in custody and was free to leave.

In *People* v. *Rodney P.* (*Anonymous*) (*supra*, p. 11) the court said: " There are, it is true, few people who would feel free to walk away from a police officer who stopped to question them. Some, hopefully most, would feel restrained out of respect for an officer of the law who is, after all, their servant and protector. Others, unfortunately, would feel restrained by fear of a police officer. But it is not any and every restraint — less actual custody or physical detention — which requires that warnings be given before questions are asked, only a significant restraint. And since, as a practical matter, a person's freedom is restrained or it is not, and he either feels free or does not, we believe that, in prefacing the word ' restraint ' with the adjective ' significant ', the Supreme Court intended that the warnings be given when the questioning takes place under circumstances which are likely to affect substantially the individual's ' will to resist and compel him to speak where he would not otherwise do so freely.' "

Since defendant called the police, who then (albeit with subjective suspicion of his story) investigated the crime, and defendant testified that he talked to the police freely as a complainant without any feeling of compulsion or restraint, the Trial Judge was correct in holding that his statements were voluntary. He was in error, in our view, in his application of the law to these facts.

Furthermore, the conversation between defendant and Taylor in the hospital as testified to by Taylor, set forth above, may not be suppressed. It was between defendant and a civilian in the absence of police (*People* v. *Horman,* 22 N Y 2d 378). Nor can it be said that Taylor was an agent of the police. The evidence is that he did not want to tell the police about the defendant; that defendant asked to speak to Taylor alone, and did; and Taylor may testify to any material conversations between defendant and him (*People* v. *Horman, supra*).

We hold, therefore, that none of the statements or acts of the defendant above recited should have been suppressed and that the order appealed from should be reversed upon the law and the motion to suppress should be denied.

GOLDMAN, P. J., DEL VECCHIO, MARSH and GABRIELLI, JJ., concur.

Order unanimously reversed on the law and motion to suppress denied.