OPINION OF THE COURT
Joseph A. Mazur, J.
This is a hearing to suppress the confession of the defendants on the ground that the defendants have been denied due process of law. A confession or admission or statement of the defendant is admissible only if its voluntariness is established by the People beyond a reasonable doubt.
The basic question before the court is whether a police officer who is a relative of a defendant can act as a relative or acts only in his official capacity as a police officer.
A thorough review of all the pertinent authorities would *347 indicate that the issue here involved is one of first impression in New York. Because of the delicate nature of the constitutional determination which the court must make, the court cannot escape the responsibility of making its own examination of the record. Based on the credible evidence adduced at the hearing, the court makes the following findings of fact and reaches the following conclusions of law.
On July 14, 1978, at approximately 12:30 p.m., Detective Leslie Hinds arrested defendant Allan Bracy at the defendant’s residence located at 2275 Randall Avenue, The Bronx, New York. In the radio motor patrol car on the way to the station the detective read to Bracy the Miranda warnings from a card. The defendant indicated that he understood all his rights and that he did not have anything to say. The defendant arrived at the 43d Precinct at approximately 1:00 p.m. Later that day at approximately 5:35 p.m., Detective Hinds arrested defendant Joseph De Pasquale at his residence, also located at 2275 Randall Avenue. In the police vehicle, Detective Hinds advised De Pasquale of the Miranda warnings. De Pasquale said that he understood his rights and that he had no statements to make. De Pasquale arrived at the precinct at approximately 5:45 p.m.
Neither defendant at any time asked to speak to an attorney.
Later that evening at approximately 6:30 p.m. Hinds received a telephone call from De Pasquale’s brother-in-law, James Turner. He stated that he was a police officer, that he was concerned about his brother-in-law and that he wanted to know what the current circumstances and situation were in which his brother-in-law was involved. Hinds told him that De Pasquale was arrested, and told him the charges involved. Turner then asked if he could come down and speak to De Pasquale, and he was permitted to do so. Between 7:15 and 7:30 p.m., the police officer, brother-in-law James Turner, arrived at the 43d Precinct. Detective Hinds testified that he told Turner the charges and informed him that neither defendants made statements. Detective Hinds also testified that he did not ask Turner to assist in obtaining statements. Hinds further testified that Turner then asked to speak to his brother-in-law, De Pasquale, who was then made available. Regarding this conversation at the station with Detective Hinds, Turner testified that he did not remember that particular conversation. Turner testified that when he arrived at the *348 precinct, he had a conversation with Lieutenant Montagnino. He said that upon entering the detective’s office, he believed that he approached the lieutenant. Turner stated that he identified himself and told the lieutenant that he was Joseph De Pasquale’s brother-in-law. Turner further testified that the substance of his conversation with the lieutenant, at that point, was as follows: That the lieutenant stated to him that the defendants were not making statements and were not cooperating and that the police had a good case against the defendants. Turner then said to the lieutenant, "All right, I’ll talk to him” ("him” being De Pasquale). On cross-examination concerning this point of the conversation with the lieutenant, Turner testified as follows:
"I said — yeah, I believe I said I’ll see what I can do. I don’t remember my exact — the way I phrased it.”
Q. (by Mr. Pozmanter) "But the substance of what occurred, the lieutenant said we have been unable to get them to make a statement and you replied, well, I’ll see what I can do about that; is that correct?”
A. "Yes.”
Lieutenant Montagnino’s version of this conversation is considerably different. The lieutenant testified as follows: "Officer Turner came to the precinct, identified himself as a police officer. I identified myself to him. He then says to me that he was on — that Mr. De Pasquale was the brother of his wife and he understood he was under arrest and I said, 'Yes,’ he was . I said, 'We got a good case.’ He said, 'Can I talk to him.’ I says, 'Yes.’ ” The lieutenant testified that that was the entire conversation he had with Turner. At this point, the officer, brother-in-law Turner, was placed in a room with De Pasquale. They were alone for approximately two to five minutes. Turner testified that he stated the following to his brother-in-law De Pasquale. "I said to him — first thing I said was, I said, Joe, I’m not — I have no idea whether you did what you’re being accused of or whether you’re involved, in what way you’re involved, if any. I said, 'That the detectives feel that they have a good case against you.’ I said, 'And I personally at this point feel that they have a good case against you. And in my judgment it would be best for you if you are in any way involved or know anyone who is involved, to tell the truth.’ ” Defendant De Pasquale testified that Turner also said that the best thing to do would be to tell the truth, and things would work out better and that we probably *349 would get a light sentence, a few months, up to a year, and that if we did not tell the truth, and we were guilty, we could get the maximum penalty, maybe 7 to 15 years.
After a brief conversation, De Pasquale asked if codefendant Bracy could come into the room. Turner relayed that request to Detective Hinds via the following testimony. (Turner): "I remember opening the door and I think it was Detective Hinds that I told we would like to have him in, Allen Bracy in also, if possible, which they agreed to, the detective agreed to and brought him in.” At that point Turner repeated to Bracy that which he had stated to De Pasquale. Turner testified as follows: "I remember saying to them that things would work out better if you told the truth and things would go better for you. Word for word — this was the substance of what I was saying. I said 'things might go better for you.’ ”
After a brief conversation the defendants decided that they wanted to make a statement. Turner, De Pasquale and Bracy were in the room together no more than five minutes. (The defendants did not confess to Turner; there is no evidence that Turner knew what statements the defendants would make.) Turner exited and stated that the defendants wished to make a statement. Detective Hinds then went into the room and asked the defendants if they wanted to make a statement. They said that they did. Hinds then again advised them of their rights. He read the Miranda warnings from the arrest reports. The defendants affirmed that they understood, and that they wanted to make a statement. At that point, the defendants both individually confessed to Detective Hinds. Hinds then asked them if they would be willing to make a statement before an Assistant District Attorney. They said that they would. Assistant District Attorney James Feretic received a telephone call from Detective Hinds at approximately 7:30 to 7:40 p.m. Feretic arrived at the precinct at approximately 8:30 p.m. Feretic again advised the defendants of their rights. The defendants once again indicated that they understood. Mr. Feretic then proceeded to take the statements.
CONCLUSIONS OF LAW
Defendants’ initial argument that once the defendants had asserted their right to remain silent all questioning had to cease permanently is disposed of in the District Attorney’s responding papers and will not be entertained here.
*350 The basic question presented in this hearing concerns the voluntariness of the confessions. CPL 60.45 is entitled rules of evidence; admissibility of statements of defendants. The application of this section to the facts presented is controlling. CPL 60.45 in its entirety reads as follows:
"60.45 Rules of evidence; admissibility of statements of defendants.
"1. Evidence of a written or oral confession, admission, or other statement made by a defendant with respect to his participation or lack of participation in the offense charged, may not be received in evidence against him in a criminal proceeding if such statement was involuntarily made.
"2. A confession, admission or other statement is 'involuntarily made’ by a defendant when it is obtained from him:
"(a) By any person by the use or threatened use of physical force upon the defendant or another person, or by means of any other improper conduct or undue pressure which impaired the defendant’s physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement; or
"(b) By a public servant engaged in law enforcement activity or by a person then acting under his direction or in cooperation with him:
"(i) by means of any promise or statement of fact, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself; or
"(ii) in violation of such rights as the defendant may derive from the constitution of this state or of the United States.”
CPL 60.45 (subd 2, par [b]) is especially important when considering the role James Turner plays in this sequence of events. James Turner is the brother-in-law of defendant De Pasquale. He is also a police officer. The question in this matter is whether James Turner was acting (1) as a public servant engaged in law enforcement activity, or (2) as a person acting under the direction of the police, or (3) as a person acting in co-operation with the police, or (4) was James Turner acting as a concerned brother-in-law attempting to help his wife’s brother, and his friend, by giving them what in his opinion was the best advice he could offer?
The evidence in this matter depicts James Turner as a man who has been a police officer for the City of New York for the last nine years. At the time of this hearing and since Novem *351 ber 11, 1978, he had been on sick report due to injuries sustained in an auto accident. He was last assigned to the 40th Precinct.
In the evening of July 14, 1978, James Turner was informed by his wife that her brother, defendant De Pasquale, had been arrested and was at the 43d Precinct. At his wife’s request, concerned with his brother-in-law’s welfare, Turner called the precinct. He was advised that his brother-in-law was indeed under arrest and he was also informed as to the nature of the charges. When Turner asked if he could come down to speak to his brother-in-law, he was answered in the affirmative. Upon appearing at the 43d Precinct, Turner spoke briefly to Detective Hinds and Lieutenant Montagnino. Although the substance of the conversation is at variance, it is quite clear that the lieutenant did not importune or invoke the assistance of Turner. The defense would have the court believe that Turner, arriving at the precinct with the intention of helping his wife’s brother, suddenly changed his intention and decided to aid the police in their investigation.
Turner appeared at the police station at the request of his wife, sister of defendant De Pasquale. His mission was to assist his relative. The totality of the circumstances and the weight of the evidence show that the police did not request the brother-in-law policeman to appear or to speak to the defendants for any purpose, let alone to gain the defendants’ co-operation with the police. Both Detective Hinds and Lieutenant Montagnino testified that they did not ask Turner to come to the precinct nor to talk to either defendant. Turner testified that he called the precinct at the behest of his wife, that he came to the precinct and asked to be allowed to speak to his brother-in-law.
Based on the above, the court finds that James Turner was not acting as a public servant engaged in law enforcement activity or as a person acting under the direction of the police or as a person acting in co-operation with the police. The court finds that James Turner was acting as a concerned brother-in-law attempting to help his wife’s brother (and his friend) by giving them, in what his opinion was, the best advice he could offer.
The constitutional and statutory safeguards against self incrimination have application only when an individual is pitted against the State or its agent. They do not obtain when it is a private party who elicits a confession, or who induces a *352 suspect to speak. (People v Lee, 33 AD2d 397, 403; United States v Solomon, 509 F2d 863, 868-869 [and cases cited therein]; United States v Antonelli, 434 F2d 335, 337-338; Yates v State, 372 NE2d 461, 463 [Ind] ["the exclusionary rule does not apply to situations where private citizens gather evidence apart from the police activity, even if the information was procured by chicanery”]; Matter of C. P. D., 367 A2d 133, 135 [DC] [defendant’s incriminating answer to stepfather’s question in presence of police raised no Miranda issue despite defendant’s earlier assertion of right to remain silent]; State v Thompson, 287 NC 303, 323 [father’s direction to son that he waive Miranda rights raised no constitutional issue even though father was a police officer]; Weatherly v State, 477 SW2d 572, 576 [Tex] [no constitutional issue when defendant’s attorney unwisely induced confession]; Peek v Commonwealth, 415 SW2d 854, 856 [Ky] [where defendant’s bail bondsman induced confession, the court held that "[t]he State is not, and should not be, charged with any undue influence, pressure, sweating, or inducement exercised by a private citizen, acting on his own, not in concert with the officers of the State”]; see Bureau v McDowell, 256 US 465, 475; People v Horman, 22 NY2d 378.)
While there do not appear to be any New York cases in point, a case similar to this may be found in State v Thompson (287 NC 303, supra) a case decided by the Supreme Court of North Carolina. In Thompson, the defendant had been arrested by the Sheriff. His father, a local police officer, was permitted by the Sheriff to attend the defendant’s interrogation. There, the father told defendant to waive his Miranda rights. On appeal, defendant challenged the voluntariness of his subsequently offered confession on the ground that his father, acting as a State agent, had unconstitutionally overcome his desire to remain silent. The North Carolina Supreme Court rejected the argument that a constitutional issue was involved merely because defendant’s father happened to also be a police officer: "Defendant’s counsel emphasized the fact that the confession was rendered involuntary because defendant’s father told him to sign waivers of rights. It must be borne in mind that although the father, Forrest Thompson, was a police officer, he was not in this case a 'person in authority’ in the sense of having defendant in his control or custody. He was present as defendant’s father and by courtesy of the Sheriff. Even in this capacity, the record does not show *353 that he threatened defendant or held out any promise or hope which would overbear defendant’s will. * * * It is reasonably inferable that the father’s acts were, in effect, admonitions to his son to tell the truth.” (State v Thompson, supra, p 323.)
Similarly, in the instant case, it is clear that James Turner, although a police officer, was not a person in authority in the sense of having the defendants in his control or custody. He was present as De Pasquale’s brother-in-law by the courtesy of the police department.
It is interesting that defendants argue that Turner induced the defendants to make statements. The record does not show that he threatened the defendants or held out any promise or hope which would overbear the defendants’ will. As in the Thompson case, it is reasonably inferable that the brother-in-law’s acts were, in effect, "admonitions to the tell the truth”.
Even accepting defendant De Pasquale’s version of the conversation and accepting defendant’s contention that Turner was acting as an agent of the police, the court finds that no promise or statement of fact as depicted by GPL 60.45 (subd 2, par [b], cl [i]) is involved in this case. The evidence is clear that no promises were made, but that Turner indicated the possible alternatives available to the defendants.
Moreover, any statements by Mr. Turner could not be relied on as the basis for a finding of involuntariness, since defendant can make no claim that he reasonably viewed his brother-in-law as being in a sufficient position of authority to execute any suggested "promise”. It is generally accepted that before a statement will be considered an illegal inducement, it must be found that the maker of that statement had the apparent power to deliver on any offered benefit. (See People v Chapman, 224 NY 463, 478-481 [police officer’s statement that defendant might be "shown some leniency” was not unlawful since District Attorney not involved]; People v Rittenhouse, 37 AD2d 866, 867 [Deputy Sheriff’s promise that defendant would be charged with only one crime, even though unkept, was not unlawful since no showing of intentional misrepresentation, and District Attorney was not involved with Deputy Sheriff’s "deal”]; see People v McCue, 48 Ill App 3d 41, 45 [court refused to suppress confession made after polygraphist told defendant that he would probably not "go to jail”, because polygraphist lacked power or authority to make such a promise]; State v Tardiff, 374 A2d 598, 601 [Me]; Lauer v State, 156 Ind App 336 [confession not suppressed even though police *354 officer indicated that defendant "might” receive a suspended sentence].)
Accordingly, the court finds that no person in authority offered any promises nor did any police official instruct, authorize or importune Turner to make any promises that the statements made by Turner were of such a nature and were stated under such circumstances that they did not create a substantial risk that the defendants might falsely incriminate themselves.
[Portions of opinion omitted for purposes of publication.]