**UNITED STATES of America, Plaintiff,**

v.

**Gilbert WOLF, Defendant.**

**No. 82 CR 274.**

United States District Court,
N.D. Illinois, E.D.

Dec. 21, 1984.

Thomas M. Durkin, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Harvey M. Silets, Silets & Martin, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

This is a prosecution for alleged tax fraud in which it is alleged that defendant Gilbert Wolf willfully understated his personal income and that of his business for the years 1975 and 1976. The United States intends to offer certain evidence obtained from Canadian tax authorities, who in turn obtained it from defendant in the course of an investigation of a Canadian company with which defendant and his company had done business. Defendant has moved to suppress the evidence because of a promise by Canadian authorities that the evidence would not be disclosed to United States tax authorities if defendant answered questions put to him in the United States by Canadian tax investigators. We conducted an evidentiary hearing on defendant's motion and now grant it.

### FACTS

In 1977, Revenue Canada began a criminal tax investigation of a Canadian company, Wilson Auto Electric ("Wilson"). Revenue Canada officials believed that Wilson was involved in a scheme under which it made purchases from certain suppliers in the United States by issuing two checks, one to the supplying company and one to its principal. The principal of the supplier would then "kick back" part of the latter payment to Wilson's principal, Fred Lew-

icki. In order to investigate the case, Revenue Canada agents determined to interview the Americans involved in the alleged scheme. One of these was defendant Wolf, principal of a Chicago company, Midwest Generator Co. ("Midwest").

On December 6, 1977, Revenue Canada forwarded to the Office of International Affairs of the United States Internal Revenue Service ("IRS") in Washington, D.C. a "collateral request" for assistance in obtaining evidence from Midwest for assistance in the investigation of Wilson. The request was made pursuant to Article XXI of the Canadian—United States Tax Convention of 1942, 56 Stat. 1399 ("Convention").[1] Revenue Canada asked the IRS to assist in arranging a meeting between Canadian agents and Wolf. Attached to the request was a memorandum prepared by a Canadian agent detailing the alleged kickback scheme as well as copies of invoices and checks allegedly involved in the scheme. The Canadian request was assigned in the regular course of the official business of the IRS to Special Agent Debra Kerwin of the IRS Chicago office. Kerwin promptly telephoned Wolf to set up a meeting.

The government's evidence at the hearing showed that on September 19, 1977, an IRS computer had selected Midwest's 1976 tax return for a civil audit. Kerwin learned of this from Wolf's accountant in attempting to set up a meeting between Wolf and the Canadian agents. IRS Revenue Agent James Tse had been assigned to conduct the civil audit of Midwest.

In due course, Kerwin arranged a meeting between two Canadian agents, George Burwood and Saul Targownik, and Wolf's attorney Gerald Risner, at Risner's office on January 23, 1978. Kerwin was present when the meeting began. Risner stated that his purpose was to ascertain whether he should advise his client to submit to an interview. He stated that he saw no benefit to defendant to be obtained from such an interview and that without prior knowledge of the questions to be asked, he would not be able to advise his client. Canadian agent Targownik stated that Revenue Canada was interested in defendant's explanation of certain transactions between a Canadian company and Midwest. Risner stated that he was concerned that whatever defendant said might be incriminatory and that the information would then be turned over to the IRS. Accordingly, Risner stated that the best advice he could give defendant was not to talk to the Canadian agents. However, Risner repeated that if he knew the specific areas the agents were interested in, he could discuss them with his client and arrive at a final decision. Targownik replied that his practice was to disclose such information only to the subject of the investigation.

Targownik then asked IRS Special Agent Kerwin to leave the meeting. Despite the fact that the Canadian agents were there under her, i.e., the IRS', auspices, were entitled only to "such information ... as the [IRS] is entitled to under the revenue laws of the United States," and Risner had tentatively refused to submit his client for interview because his statements might be self incriminatory, Special Agent Kerwin complied with Targownik's request and left the meeting.

Targownik then falsely stated to Risner that the IRS did not yet have any information concerning Midwest's dealings with

1. Article XXI provides:

　1. If the Minister [of National Revenue of Canada] in the determination of the income tax liability of any person under any of the revenue laws of Canada deems it necessary to secure the cooperation of the Commission [of the IRS], the Commission may, upon request, furnish the Minister such information bearing upon the matters as the Commissioner is entitled to obtain under the revenue laws of the United States of America.

　2. If the Commission in the determination of the income tax liability of any person under any of the revenue laws of the United States of America deems it necessary to secure the cooperation of the Minister, the Minister may, upon request, furnish the Commissioner such information bearing upon the matter as the Minister is entitled to obtain under the revenue laws of Canada.

Wilson and that if defendant cooperated in explaining the transactions with Wilson, the information given to the Canadians would not be given to the IRS. At the evidentiary hearing, Canadian agent Burwood admitted that this was, in his words, a "bluff"—because the Canadian agents knew that the IRS already had certain information, via the memorandum which accompanied the Canadian collateral request. According to Burwood, the Canadians were merely attempting to exercise some leverage in order to obtain the information which they sought.

Risner responded that he still did not see how defendant would benefit from talking to the Canadians. Targownik replied that if defendant did not cooperate, the information Revenue Canada had concerning the transactions would be turned over to the IRS. Again, what Risner did not know was that the IRS already had certain of the information.

Risner then expressed concern that if defendant's cooperation eventually resulted in defendant having to testify in a Canadian court concerning Midwest, the IRS would be able to obtain the information simply by ordering a transcript of the testimony. Targownik repeated his earlier offer that information provided by defendant to the Canadian authorities would not be disclosed to the IRS. Risner then agreed to talk with defendant and report back to the Revenue Canada agents.

The parties met again the following day. Special Agent Kerwin was not present. Under a procedure proposed by Risner, the Canadian agents reviewed various documents and made a list of specific questions. They then left the room for approximately 30 minutes while Risner and defendant conferred. Risner then informed the agents that defendant would answer their questions. Defendant proceeded to answer all of the questions and provided all of the information requested by the Canadians. In particular, he explained that the reason for certain payments made to him personally was to replenish personal funds he had used to purchase automotive parts which were shipped to Wilson. Apparently the parts had to be paid for in cash. Defendant had thus instructed Lewicki to issue two checks, one to Midwest for the invoice amount of the parts, and one to defendant for the balance not invoiced. Defendant stated, in response to a question by the agents, that he had claimed only a portion of the cash purchases as a business expense.

The Revenue Canada agents had some difficulty comprehending defendant's explanation, which he amplified with an example:

> [Wolf] purchases parts for $10,000. [Midwest] agree[s] to sell to [Wilson] for $12,000. He would personally pay the $10,000 in cash. He would then prepare a purchase invoice for $4000.00 and charge the $4000 to an Account Payable account in his name at Midwest. He then would draw a company cheque to his favour to clear the account payable. He would then invoice [Wilson] for $6000 and he would receive a cheque to his company for $6000 and a cheque to himself personally for $6000. Therefore the same profit is reported.

Govt.Ex. 6 at 4–5. Though under defendants' example Midwest has the same profit margin and thus pays the same income tax as it would have had the transaction been handled in a more "normal" fashion, the result is that defendant obtained $6000 in his own name. Defendant stated at the meeting with the Canadian agents that he used the checks issued to him to pay for the parts from Midwest's supplier.

The Revenue Canada agents asked defendant why he did not simply draw a check on Midwest's account to pay for the parts. Defendant responded that his method had been "stupid" and that he had begun to use the suggested method; he denied, however, that he had ever paid kickbacks to Lewicki.

Dissatisfied with defendant's oral responses—although there is no evidence that they were untrue—the Revenue Canada agents broadened their inquiry. They requested defendant's personal financial

records (cancelled checks, tubs etc.). After some discussion, defendant and his counsel declined the new request and Revenue Canada's investigation in the United States was terminated.

Thereafter, the IRS audit of Midwest escalated to a fraud investigation of defendant and Midwest. The IRS fraud investigators made a collateral request of Revenue Canada under the Tax Convention of 1942. In response, Canada provided the IRS with all of the information it had concerning defendant and Midwest, including defendant's statements made in January 1978.

We have no difficulty finding that the Canadian agents made an offer to Risner that nothing—either defendant's expected statements or the evidence the agents already had—would be provided to the IRS if defendant cooperated by explaining the transactions his company had with Wilson. Defendant accepted the offer and spoke with the agents. Thus, defendant performed his end of the bargain. Though it was implicit in the agreement that defendant was required to tell the truth (otherwise the agreement would have been meaningless from the Canadians' view), there is no evidence that defendant did not uphold his end of the bargain. Finally, while defendant did not provide the Canadians with his personal bank records as they requested, the agents' own testimony and memoranda establish that that was an "afterthought" that they attempted to add to the deal after it had been concluded and defendant had performed.

We also find that the Canadians did not uphold their end of the agreement. The government argues that the agreement not to turn over information to the IRS did not prevent the Canadians from disclosing information pursuant to a properly made collateral request and that the Canadian government could not properly refuse such a request. Article XXI of the Convention

does not support the government's argument. It states that Canadian authorities "may" turn over information when such a request is received. Compliance was not mandatory. The Canadian government could have told the IRS that its agents had agreed not to turn over the requested information.

Thus, there was an agreement between defendant and Revenue Canada that Revenue Canada breached, and the question is whether the United States should be made to bear the consequences of that breach. In the normal motion to suppress, the defendant seeks to exclude evidence that is tainted by wrongdoing on behalf of the government that is prosecuting him, or some affiliated government that operates under the same rules. *See Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (federal government cannot use evidence obtained illegally by state law enforcement officers). Here, however, we are dealing with Revenue Canada, an entity that does not operate under the same rules of law that govern domestic law enforcement authorities.[2] In that sense, the case is somewhat analogous to those involving alleged violations of constitutional standards of conduct by private persons or foreign law enforcement agents operating in their own country.

We begin with cases involving private or foreign searches and seizures. In general, American courts have suppressed evidence obtained by private persons or foreign law enforcement authorities only where domestic authorities have participated in some manner in the illegal conduct. This is illustrated by *United States v. Marzano*, 537 F.2d 257 (7th Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977). *Marzano* involved a prosecution for theft of $3 million from the vaults of Purolator Security in Chicago. Shortly after the theft, the FBI had traced the de-

---

**2.** No argument has been made that the evidence should be suppressed because its use would violate Canadian law. *See United States v. Phillips,* 479 F.Supp. 423 (M.D.Fla.1979). *But see United States v. Morrow,* 537 F.2d 120, 140 (5th Cir.

1976). In any event, we do not know whether agreements of the type made and broken here are specifically enforceable against the Canadian government.

fendant and another (who was found not guilty) to Grand Cayman Island in the Caribbean. The two were arrested by Grand Cayman police and flown back to the United States. When they were taken into custody by the Grand Cayman police, money and various other items were taken from them. The defendants motion to suppress evidence was denied because FBI agents, though present at the time, acted "merely as observers and did not substantially participate in the arrest and seizure of evidence." *Id.* at 269. Defendants' argument was that probable cause for the arrest did not exist. The court stated that the same standard applied to private searches and searches by foreign law enforcement officials: the fruits of such searches may be used if American government agents "did not participate in the search." *Id.* at 269–70. When the FBI agents arrived on the island, they were informed by local officials that they had no jurisdiction to operate there but could accompany the local police on their investigation. Grand Cayman police took the defendants into custody for violations of local law and asked them to board a plane for Miami after learning that the FBI was willing to pay their airfare. The FBI did not in any way participate in the arrest and search. *Id.* at 270.

The court rejected the argument that the evidence should be suppressed since "but for" information provided to Grand Cayman police by the FBI, defendants never would have been arrested. The court agreed with the factual predicate of defendants' argument, but it held that "the law is clear that providing information to a foreign functionary is not sufficient involvement for the Government to be considered a participant in acts the foreign functionary takes based on that information." *Id.* (citing case). Further, the court stated, the FBI agents mere presence at the scene was not sufficient to make them participants in the arrest or search. Nor was the coincidence of these two factors significant. *Id.*

Defendant in *Marzano* relied on an earlier Seventh Circuit case, *Knoll Associates v. FTC*, 397 F.2d 530 (7th Cir.1968), in which the court had held that documents stolen by a private citizen for the purpose of assisting the FTC in a pending proceeding were inadmissible.[3] The court noted that it had distinguished *Knoll* where the items challenged were acquired for purposes independent of helping the government and where they had been acquired a substantial period of time before being turned over to the government. Since defendant in *Marzano* was arrested because he violated Grand Cayman law, the court said, *Knoll* was inapposite. The mere fact that Grand Cayman police also intended to help the United States government did not "transform an otherwise private search into a Government search." *Id.* at 271. Finally, the court noted that the purpose of the exclusionary rule under the fourth amendment is to deter violations of that constitutional provision. "No purpose would be served by excluding the evidence taken by [Grand Cayman police] and turned over to the FBI in Grand Cayman," *id.*, since what an American court did would not alter the arrest and search policies of Grand Cayman police.

In a case involving legal issues closer to those involved here, the Seventh Circuit declined to enforce against the United States a promise made by state law enforcement agents not to prosecute a person for a particular offense. In *United States v. Long*, 511 F.2d 878 (7th Cir.), *cert. denied*, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975), defendant was arrested by Illinois officials for alleged narcotics and firearms violations. He was charged, however, for narcotics violations only. The district court found that Illinois officials had agreed that if defendant cooperated with them on the narcotics charges, he would not be prosecuted for any firearms violation. Among the firearms charges that could have been brought against defendant were violations of federal law; the district court concluded that Illinois agents

---

**3.** *Knoll* has been criticized. *See* 1 W. LaFave, Search and Seizure, § 1.6(e) at 134–36 (1978).

who investigated, arrested and charged a defendant with federal violations were, in a functional sense and in the eyes of the defendant, agents of the United States. Accordingly, it dismissed the indictment because it had been brought in violation of the promise made to defendant.

The court of appeals reversed, holding that "the existence of an agency relationship was essential to support the action of the district court," *id.* at 881, and none existed. The court stated that it remained the law that " '[t]he government is not bound by acts of persons who never have been, or in fact have ceased to be, its agents.' " *Id.* (quoting *Newman v. United States*, 28 F.2d 681, 682 (9th Cir.1928), *cert. denied sub nom. Boyd v. United States*, 279 U.S. 839, 49 S.Ct. 253, 73 L.Ed. 986 (1929)). Defendant had failed to show, the court stated, that there was an agency relationship between the Illinois agents and the federal government, "or even that the federal government was aware of the defendant's alleged agreement with [the Illinois agents]." *Id.* at 881–82. Nor did the facts that defendant was arrested for offenses that could be prosecuted under federal law or that state agents frequently testified for the United States in federal prosecutions render the United States responsible for the alleged breach of promise.

Can it be said here that IRS agents did not participate in the conduct of which defendant complains? We think not. The Revenue Canada agents' meeting with defendant's counsel Gerald Risner was arranged and conducted under the auspices of the IRS. The initial contacts and arrangement were made by IRS Special Agent Kerwin, who then escorted the Canadian agents to Mr. Risner's office. Kerwin was present when the Canadian agents initially refused to disclose to Risner the intended content of their inquiry. She, however, knew of the nature of the inquiry from the memorandum accompanying the Canadian collateral request. She was present when Risner stated he was concerned that defendants' responses might be self incriminatory and would be turned over to IRS. At this point it would not have been inappropriate for Kerwin to terminate the conference for the Canadians were entitled to only such information as the IRS is "entitled to obtain under the revenue laws of the United States." Article XXI, supra. Under similar circumstances, an IRS agent would be obliged to honor an American taxpayer's invocation of his constitutional right to remain silent. But instead, Special Agent Kerwin subordinated herself to and complied with the request of the Revenue Canada agents that she depart and leave the meeting to them.

Whether Kerwin knew or was aware of the agreement the Canadian agents made is a close question. She was not directly aware of it in the sense that she heard it made and there is no evidence she was told it existed. However, under the circumstances of the meeting with Risner, the ubiquitous reasonable person to whom the law constantly holds its subjects, would have been aware that some sort of a deal was going to be proffered and concluded after she left the room. Agent Targownik's request that Kerwin leave was immediately preceded by Risner's statement that he was concerned that whatever defendant told the Revenue Canada agents might be incriminatory and would be turned over to the IRS. This would have alerted a bystander unfamiliar with tax investigations that defendant was concerned that he risked United States criminal liability by reason of his transactions with the Canadian company. It strains credulity to believe that Kerwin was not aware when she left the room that the Revenue Canada agents would offer not to disclose Wolf's statements to the IRS.

That Kerwin was aware that the Revenue Canada agents would promise not to disclose defendant's statements does not mean she similarly was aware that the agents would also promise not to turn over the information they already had concerning the defendant-Wilson transactions. That information was not the subject of Risner's expressed concern. Moreover, Kerwin already had some, if not all of the documentary information the Canadian

government had regarding defendant, via the collateral request memorandum. Thus, we cannot conclude that Kerwin knew or should have known of the promise not to disclose *that* information.

This distinction is critical. The promise not to disclose defendant's statements was not deceitful in itself. The promise not to turn over other information was deceitful, since Revenue Canada had already turned over the information to the IRS (we decline to accept agent Burwood's euphemism "bluff"). Both promises could lead to suppression of defendant's statements made at the meeting, for it was in reliance on both of them that defendant talked with the Revenue Canada agents on the advice of his counsel. However, a holding that the promise not to disclose defendant's statements could be "enforced" against the United States would not lead to suppression of the documentary information the Canadian agents already had. That result can flow only from a holding that the second part of the promise can also be "enforced" against the United States. As we have noted, the factual predicate for the latter holding is weaker than for the former, for it cannot be said that Kerwin knew or should have known of the second part of the promise.

The level of participation of American authorities here would be insufficient (indeed, unnecessary) had the conduct occurred in another country. That it occurred on American soil requires a different analysis. The fact that the Canadian authorities filed the collateral request and requested the IRS to set up the meeting with defendant and his counsel, manifests the need for the permission and participation of our government in the Canadian investigation in this country. Though we noted at the evidentiary hearing that there was nothing to prevent the Revenue Canada agents from coming here and talking to defendant without IRS involvement, it is likely that the principle of comity among nations forbids such conduct.

Though there is no rule that American law enforcement officers must supervise the conduct of foreign officers in an investigation in American territory simply because it relates to Americans or an American criminal offense, a different rule should obtain where foreign officers are doing business in this country with the permission and under the auspices of our government. For example, if the Canadians had illegally broken into defendant's place of business and taken his records and then turned them over to the IRS, we would have no difficulty in suppressing the evidence in a later prosecution. That the persons conducting the search are law enforcement officials who are operating here by the grace of our government is, in our view, sufficient to distinguish such a case from one involving a private search or one like *Long* in which the federal authorities were completely divorced from the officers who made the promise to the defendant. Private persons conducting private searches and state officers making promises to defendants are, relatively speaking, beyond the control of the federal government, at least until they have been found out. By contrast, when a foreign law officer operates here only under our government permission, he should be held to our standards of conduct. And to allow the United States to benefit from the activity of foreign agents in this country simply because it did not directly participate in the conduct in question would permit our government to permit foreign law enforcement officials to enter our country and conduct their business with impunity, and deliver the fruits thereof to our government for use in a prosecution. That is a notion we should not embrace.

Therefore, the federal government's participation in the Revenue Canada agents' visit to the United States and its sponsorship of the Canadian investigation and interrogation, and its awareness of defendant's apprehension and invocation of his right to remain silent, were sufficient under both *Marzano* and *Long* to make the Revenue Canada agents' promises "enforceable" against the United States.

It is easy to conclude, that the statements defendant made to the Canadian agents must be suppressed. Statements

made in reliance upon a promise are considered involuntary and must be suppressed under the fifth amendment. *See Brady v. United States*, 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970); *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897).[4]

Though we have found no cases involving promises not to disclose existing information, similar promises have been enforced against the governmental entities that made them. For example, in *Rowe v. Griffin*, 676 F.2d 524 (11th Cir.1982), a paid FBI informant had reported to his FBI contact that he was with three men who killed a civil rights worker, but that he had not participated in the murder. Federal and state officials assured him immunity from prosecution if he testified against the people who committed the murder. The informant held up his end of the bargain. Several years later, new evidence surfaced indicating that the informant had participated in the killing, and a state indictment was returned against him. The court enjoined the state prosecution because it violated the promise that had been made to the informant. It noted that the state had benefitted from the informant's performance at his end of the bargain, and it stated that

> when such a promise induces a defendant to waive his fifth amendment rights by testifying at the trial of his confederates or to otherwise cooperate with the government to his detriment, due process requires that the prosecutor's promise be fulfilled. We hold that once the defendant's good faith compliance with the terms of the agreement is established, the state must perform on its side....

Id. at 528.

In *United States v. Brimberry*, 744 F.2d 580 (7th Cir.1984) the court of appeals held it to be plain error for the trial court to fail to inquire *sua sponte* as to whether the government's prosecution of defendant violated an earlier plea agreement under which defendant provided information to the government repeating that "any agreement made by the government must be scrupulously performed and kept." *United States v. Lyons*, 670 F.2d 77, 80 (7th

4. Indeed, it is arguable that these statements should be suppressed even if the promise is not enforceable against the United States. The theory under which statements made in reliance on a promise or due to threats are suppressed is not that the government should be deprived of the benefits of its conduct but rather that the statements cannot be considered credible because they were not voluntarily made. *See Brady*, 397 U.S. at 754, 90 S.Ct. at 1472 (such confessions are barred not because promise is illegal but because possible impact on defendant is "too great to ignore and too difficult to assess") *Bram*, 168 U.S. at 543, 18 S.Ct. at 187. Though there are no federal cases directly on point, most state courts which have addressed the issue have held that the prohibition against admitting involuntarily made statements extends even to statements made to private persons, at least in some circumstances. *See, e.g., Hinshaw v. State*, 398 So.2d 762, 764 (Ala.Crim.App.1981) (promise by victim not to press charges), *People v. Bracy*, 98 Misc.2d 346, 413 N.Y.S.2d 969, 975 (Sup.Ct.1979) (involuntary if promisor had apparent power to deliver on offered benefit); *Allen v. State*, 53 Ala.App. 66, 297 So.2d 391, 397–98 (Ala.Crim.App.) (statement in reliance on promise by one who may be fairly supposed to have power to secure benefit is inadmissible), *cert. denied*, 297 So.2d 399 (1974); *Agee v. State*, 185 So.2d 671, 674 (Miss.1966) (offer of reward by private individual renders confession involuntary); *State v. Benavidez*, 87 N.M. 223, 531 P.2d 957, 960 (1975) (involuntary if defendant might reasonably consider promisor as able to perform); *Porter v. State*, 206 Ark. 758, 177 S.W.2d 408, 410 (1944) (confession by accused larcenist inadmissible if induced by promise of victim to make it easy on him). *But see Steiner v. United States*, 134 F.2d 931, 935 (5th Cir.) (lawyer accused of mail fraud made confession to state bar official who offered to try to exert influence to secure leniency; court held that confession was not involuntary), *cert. denied*, 319 U.S. 774, 63 S.Ct. 1439, 87 L.Ed. 1721 (1943); *State v. Triplett*, 79 N.W.2d 391 (Iowa 1957) (suggestion by volunteer investigator concerning time defendant would spend in custody if he confessed was merely speculative, and investigator was not in position to influence time of incarceration); *Fields v. State*, 77 Okl.Cr. 1, 138 P.2d 124, 130 (1943) (only statements made in reliance on promise/threat by government officer, person with authority over defendant, or private person in presence of one of above should be suppressed). We read *Steiner*, the only federal case we have found on the subject, as holding that in the circumstances there the statements were not involuntarily made, not that a confession to a private person can under no circumstances be suppressed as involuntary.

Cir.), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). So, too, must an agreement such as in the case at bar which is attributable to the government.

*See also, e.g., United States v. Rodman,* 519 F.2d 1058 (1st Cir.1975) (SEC promised to strongly recommend to U.S. Attorney not to indict defendant in return for cooperation; defendant agreed and complied; SEC did not make recommendation; indictment dismissed); *United States v. Sanderson,* 498 F.Supp. 273 (M.D.Fla.1980) (promise not to indict in return for cooperation regarding counterfeiting scheme; prosecutors indicted defendant, believing that she had not made full disclosure; court dismissed indictment after finding that defendant had fully complied); *United States v. Pascal,* 496 F.Supp. 313, 315 (N.D.Ill. 1979) (Roszkowski, J.) (defendant agreed to cooperate in DEA investigation in reliance on promise that DEA would recommend that he not be indicted and that indictment was extremely unlikely after such a recommendation; defendant indicted after DEA falsely informed U.S. Attorney that he had not fully cooperated; indictment dismissed); *In re John Doe,* 410 F.Supp. 1163 (E.D.Mich.1976) (FBI agent promised person that he would not have to testify or answer any questions if he agreed to surrender narcotics; grand jury subpoenaed person after he complied; order entered granting him use immunity; order vacated and agreement enforced).

Here defendant gave up his right not to answer the questions of the Canadian agents in reliance on their promise not to turn over the information they had to the IRS. Defendant lived up to the bargain; the Canadian agents did not. The government argues that defendant's reliance interest can be fully protected by simply suppressing the statements made at the interview; such a remedy, the government urges, will put the parties in the position they were in before the agreement with the Revenue Canada agents was made. However, in each of the above cases (with the exception of *John Doe*) it would have been possible to vindicate the promisee's reliance

interest by suppressing the statements made to the government and the fruits of those statements. Instead of employing such a remedy, however, the courts enforced the promisee's expectancy by granting him the benefit for which he had bargained. That is the remedy we will employ here.

The government has four other arguments why the evidence (all or part of it) should not be suppressed. First, it argues that the Canadian agents' promise was not within their authority. That argument is foreclosed by *United States v. Cook,* 668 F.2d 317, 320 (7th Cir.1982) ("the crucial question is not whether the government had the authority to carry out the promise ..., but whether it did in fact make the promise"). Second, in an argument closely related to the first, the government argues that the Convention requires the respective countries to fulfill properly made collateral requests, and thus even if the agents had the authority to make the promise to defendant, it was a promise that could not legally be carried out. We think that *Cook* answers this argument even if it is firmly based, but for reasons stated earlier we see nothing in the Convention that would deny Canada the ability to turn down a collateral request because of a promise like that made here. Next, the government argues that it had an independent source for the documentary evidence, *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), including the Revenue Canada agents' memorandum describing the scheme, because those materials were attached to the initial Canadian collateral request. However, agents Kerwin and Miele both testified that they did not fully comprehend the information in the documents when they had them, and in any event those documents were later returned to Canada.[5] Thus, the fact that the IRS had some documents before the defendant—Targownik interview does not mean that the government obtained those it now has through an independent source. Nor was the government's receipt of the documents in response to the IRS' collateral request a source independent of the bro-

---

**5.** It appears that the Revenue Canada agents'    memorandum was not returned, or perhaps a

ken promise, for had the promise been performed Revenue Canada would have refused the collateral request. Finally, the government argues that it inevitably would have discovered the material. *See Nix v. Williams,* —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). This argument is no different than its "independent source" argument, for the government would not have discovered the documents at all had the Canadians complied with their promise. For these reasons, the government's counterarguments are without merit.

Defendant's motion to suppress is granted. The government may not use at trial the statements defendant made to the Canadian revenue agents or the documents obtained from Canada pursuant to the government's collateral request, or any fruits of that evidence. Cause set for report on status on January 2, 1985 at 9:30 a.m.

copy was kept. Thus, this document was obtained independently of the broken promise. However, since the document does not contain any statements of Wolf or Lewicki, we see no theory under which it would be admissible at trial.