### State of Vermont v. George J. Hohman

[392 A.2d 935]

No. 350-76

Present: **Barney, C.J., Daley, Larrow, Billings and Hill, JJ.**

Opinion Filed August 1, 1978

*M. Jerome Diamond,* Attorney General, and *Richard A. Unger,* Special Assistant Attorney General, Montpelier, and *Raymond Bolton,* Bennington County State's Attorney, Bennington, for Plaintiff.

*William K. Sessions, III,* Addison County Public Defender, Middlebury, and *Donald A. Graham,* Windsor and Orange Counties Public Defender, White River Junction, for Defendant.

**Daley, J.** The defendant was charged with murder in the first degree for the killing of a young girl in the Town of Shaftsbury. As a defense to the charge he claimed to have been legally insane at the time of the offense. In a trial by jury, from which he was absent at his personal request, he was found guilty of murder in the second degree. On appeal the defendant alleges several claims of prejudicial error. We hold that two of the errors raised by the defendant so impinged upon his fundamental right to a fair trial that we are compelled to overturn the conviction and order a new trial.

The first claim involves certain highly prejudicial statements, made by the defendant and introduced into evidence upon the cross-examination of his expert psychiatric witness in violation of statutory law, 12 V.S.A. § 1612, as interpreted by this Court. The second claim relates to the defendant's admissions, obtained by the police and introduced at trial in violation of the Fifth Amendment protections set out in *Miranda* v. *Arizona,* 384 U.S. 436 (1966).

The offense with which the defendant was charged occurred on April 8, 1976. On the following day a psychiatrist, Dr. Toolan, examined the defendant pursuant to court order and determined that the defendant was sane at the time of the offense. Four months later on August 31, 1976, the defendant interposed his defense of not guilty by reason of insanity. The State immediately thereafter on September 1, 1976, moved to have the defense disclose the name of its psychiatric expert witness. On November 2, 1976, the defendant disclosed that Dr. Payson would testify on his behalf.

At trial commencing on November 8, 1976, Dr. Toolan testified as the State's psychiatric expert and Dr. Payson

appeared for the defendant in the same capacity. Before cross-examining Dr. Payson, the State moved for the opportunity to review all written materials submitted to Dr. Payson in connection with his examination of the defendant, which motion was granted. Included in these materials was a five page document entitled "Client Conference" dated April 13, 1976, which contained admissions by the defendant to an investigator from the public defender's office representing the defendant. In a pretrial motion the defendant had sought to suppress all these admissions and renewed the motion prior to the State's cross-examination of Dr. Payson. The court, however, denied the motion on both occasions and, in response to the State's questions on cross-examination, Dr. Payson testified to certain admissions contained in the client conference report which described in gruesome detail the defendant's actions and mental processes as he strangled his victim and disposed of her body.

The defendant argues that the introduction of this evidence violated his physician-patient privilege to his substantial prejudice. We agree and reverse accordingly.

The physician-patient privilege in this jurisdiction, codified under 12 V.S.A. § 1612, prohibits a physician from disclosing any information acquired while attending his patient unless there is a waiver either by the patient or by express provision of law. Based on this statute we have recently held, on facts strikingly similar to those before us now, that when a defendant consults a psychiatrist for the purpose of preparing his defense of insanity, any admissions made during that consultation which tend to prove the commission of the crime charged are privileged and cannot be introduced at a trial for that crime. *State* v. *Lapham*, 135 Vt. 393, 377 A.2d 249, 255–56 (1977).

In *Lapham*, the defendant was charged with first degree murder and had raised an insanity defense. The psychiatric expert for the defense testified to admissions made to him by the defendant that went to the issues of malice and premeditation, essential elements of the crime charged. Although *Lapham* is distinguishable from the case at bar by virtue of the fact that the present defendant did not make the

disputed admissions directly to the psychiatrist but to an investigator employed by his defense counsel, this distinction does not limit in any way the present applicability of *Lapham*. In that decision we recognized the need to insure that a psychiatric examination be conducted in an atmosphere of candor conducive to the full disclosure necessary if the physician is to form an objective and independent judgment on the issue of sanity. The full disclosure contemplated certainly encompasses all statements made by the defendant and acquired by the physician while attending the defendant that might bear upon his sanity regardless of when or to whom those statements were made. The statutory privilege, by its terms, prohibits the physician from disclosing any information, not just admissions made directly to him. As interpreted by *Lapham* the statute squarely controls the instant case to the extent of requiring the exclusion of any admissions relating to the elements of the crime. By so holding we find it unnecessary to reach defendant's further claim that the failure to suppress the admissions testified to by Dr. Payson violated defendant's right to due process under the United States Constitution.

The State, however, would have us hold the error to be harmless. Quite to the contrary, from our reading of the record, these statements bore directly upon the issue of premeditation and malice, the essential elements of the crime charged, and as such constituted the most direct and devastating evidence in the State's case. *Compare State* v. *Lapham*, *supra*, 135 Vt. at 404, 377 A.2d at 255–56. We therefore hold that they prejudicially affected the substantial rights of the defendant. See V.R.Cr.P. 52.

We consider next the admissions made by the defendant to the police on April 9, 1976. These statements the defendant claims were improperly admitted at trial in violation of his right against self-incrimination under the Fifth Amendment to the United States Constitution and Chapter I, Article 10 of the Vermont Constitution. Before stating the applicable law, it will be helpful to first set out the statements and the context in which they occurred, as indicated by the record.

At 3:40 A.M. on April 9, 1976, the defendant flagged down a Bennington police officer and asked to be taken to the police station. En route the defendant recounted that he had killed

a girl the day before and that the killing had occurred in Shaftsbury, Vermont. He then told the officer, "I strangled her. I don't know why. I just did it." The officer advised the defendant to keep silent until he could be informed of his constitutional rights.

Upon arrival at the police station the defendant was led upstairs into a room used both for interrogation and classroom purposes. There were two officers present while the defendant was read his rights from the State's Attorney Miranda Warning and Public Defender Rights Form. At about this time the state police were notified of the incident which had occurred in their jurisdiction. The defendant read and claimed to understand his rights, and then acknowledged the receipt of his rights with his signature. He nevertheless refused to sign the "Waiver of Rights" provisions at the bottom of the form without his lawyer being present.

Despite this refusal, the officer persisted and asked whether the defendant was willing to make a statement anyway. Defendant agreed to do so "up to a point," and recorded the following on tape:

> You go up the East Road and turn off into South Shaftsbury, and there you will find a dirt road on the right. In there you will find the body of the young girl. End of statement.

When questioned further as to whether he would be willing to tell the police about the body, the defendant declined for the second time to proceed further without a lawyer.

While one officer attempted without success to reach the public defender, the other officer continued in his questioning of the defendant who responded with statements concerning the time and location of the event and the identity of the victim. In addition, the information needed to complete the arrest sheet was obtained. When advised by Officer Martin that the public defender could not be reached, the defendant declined to have another attorney contacted in the interim stating, "No, I'll wait until he's present." This statement ended the taped recording and marked the third time the defendant expressed his desire to await the presence of his attorney before proceeding. When advised further that the

state police wanted to speak with him the defendant responded, "I'll play it by ear."

Upon arrival, the state trooper proceeded to elicit various statements from the defendant including a description of the victim and a detailed accounting of the events leading up to the strangulation. In response to questioning, the defendant agreed to show the police where he had left the body. In the process of leading the way to the victim's body and to her clothes found some distance from the body, he made several statements describing the exact location of the evidence. Once the body was discovered the state trooper arrested the defendant and handcuffed him. In response to further questioning the defendant stated that he had left a note for his wife "explaining everything that I've done." When asked if he had planned to bury the victim in the box which was found lying over the upper portion of the victim's body, the defendant declined to answer any more questions stating, for the fourth time, that he wished to consult an attorney before proceeding further.

■ By motion to suppress the defendant sought to have excluded all of his admissions and all evidence flowing from them from the time he entered the police cruiser and was advised to remain silent. In denying the motion, the trial court found that until the body was discovered and the defendant arrested, he was not in custody, and that he had effectively waived his right to have counsel present during the interrogation by his actions and statements. On appeal, however, the defendant argues that once he had completed his taped statement at the police station with the words "end of statement," the statements made thereafter were as a matter of law improperly admitted to his substantial prejudice. We agree.

The defendant argues the admission of his statements violated his right against self-incrimination as protected by the prophylactic guidelines judicially imposed by the United States Supreme Court in *Miranda* v. *Arizona, supra.* The argument on the facts of this case is directed, not at the failure to give the requisite warnings, but at the failure to honor the warnings once given. The procedural safeguards of *Miranda* apply only where the defendant is subjected to cus-

todial interrogation. *Miranda* v. *Arizona, supra,* 384 U.S. at 445. The parties do not seriously dispute that the defendant was subjected to interrogation. The dispute begins, rather, with the element of custody, and our task is to determine whether there is any credible evidence to support the trial court's finding that no custody existed until the time of arrest.

*Miranda* interprets the concept of custody to include the deprivation of freedom of action in any significant way. *Id.* As the case law has developed under *Miranda,* each new factual situation spawns a debate on whether those particular facts constitute custody. The search for a test based on key factual elements whose presence will conclusively and in all cases determine custody is an oversimplification of the process of judicial interpretation under *Miranda.* It is necessarily an objective test based on the totality of circumstances in each particular case. *United States* v. *Hall,* 421 F.2d 540, 544–45 (2d Cir. 1969); *State* v. *Mumbaugh,* 107 Ariz. 589, 594, 491 P.2d 443, 448 (1971).

Given the fact that it was the abuses of incommunicado interrogation in a police dominated atmosphere which disposed the Supreme Court to act in *Miranda,* see *United States* v. *Akin,* 435 F.2d 1011, 1013 (5th Cir. 1970), the determination of custody must focus on the compulsive aspect of the custodial interrogation. *United States* v. *Caiello,* 420 F.2d 471, 473 (2d Cir. 1969). The key question is whether the defendant could reasonably have believed he was not free to leave, *United States* v. *Hall, supra,* 421 F.2d at 545; *Commonwealth* v. *Marabel,* 445 Pa. 435, 283 A.2d 285, 288 (1971). The strength or the content of police suspicion, see *United States* v. *Caiello, supra,* 420 F.2d at 473, or the degree of investigative focus on the defendant, see *Beckwith* v. *United States,* 425 U.S. 341, 345 (1976), is relevant only to the extent that either contributed to the defendant's reasonable belief that he could not leave. The giving of the *Miranda* warnings at the outset does not conclusively determine the existence of custody, *United States* v. *Akin, supra,* 435 F.2d at 1013, nor does the absence of restraints such as handcuffs necessarily determine the lack of it. See *Hicks* v. *United States,* 382 F.2d 158, 161 (D.C. Cir. 1967).

 Our review of the record compels a conclusion that the defendant, once he had finished his recorded statement at the police station, was in custody and reasonably believed he was not free to leave. The fact that the State may have had probable cause to arrest based on the strength of defendant's confession as an admission against penal interest, see *United States v. Harris,* 403 U.S. 573, 583 (1971), is not, by itself, compelling but becomes so when coupled with the following additional facts. One police officer with the assistance of another gave the defendant his *Miranda* warnings. The officer continued to conduct an incommunicado interrogation of the defendant in a room customarily used for that purpose. In the course of questioning one officer filled out an arrest form on the defendant. Yet a third officer, a state trooper, arrived and conducted further interrogations. It has been held that where there is probable cause it is presumed that the police will do their job and arrest. *State v. Mumbaugh, supra,* 107 Ariz. at 594, 491 P.2d at 448. Whether the police actually believed the defendant is irrelevant if the defendant, placed in a situation characterized by incommunicado interrogation and a police dominated atmosphere, reasonably believed he was not free to leave. That it was the defendant who initially flagged down the police cruiser and voluntarily appeared at the police station, a fact made much of by the State, is relevant to our consideration, see *Oregon v. Mathiason,* 429 U.S. 492, 493 (1977); *People v. Lee,* 33 App. Div. 2d 397, 308 N.Y.S.2d 412, 417 (1970), but does not preclude our finding of custody. The proper question is not whether the defendant appeared of his own free will, but whether he reasonably believed he was free to leave. See *State v. Howe,* 136 Vt. 53, 386 A.2d 1125, 1129–30 (1978).

 Our determination that *Miranda* applies to this case based on the existence of custodial interrogation requires not only that the defendant be informed of his rights, but that certain procedures be followed thereafter to insure that the informing of rights is not a meaningless formality. The procedure relevant to the instant case is as follows:

> If, however, [the defendant] indicates in any manner and at any stage of the process that he wishes to consult

with an attorney before speaking there can be no questioning. [*Miranda* v. *Arizona, supra,* 384 U.S. at 444–45.]

The State claims and the trial court found that the defendant waived his rights under *Miranda* by his statement "I'll play it by ear" and by his conduct in subsequently cooperating with the police and leading them to the victim's body. Any waiver by the defendant must have been obtained, however, in compliance with the above-quoted procedural requirement of *Miranda.*

The waiver of the right to the procedural safeguards of *Miranda* requires that the prosecution clearly demonstrate that the defendant knowingly and intelligently waived such rights, *State* v. *Breznick,* 134 Vt. 261, 264, 356 A.2d 540, 542 (1976). The burden on the State is a heavy burden as every reasonable presumption will be indulged against the waiver of constitutional rights. *Johnson* v. *Zerbst,* 304 U.S. 458, 464 (1938).

The extent of the circumstances to which the State can point to justify a finding of waiver is the defendant's statement "I'll play it by ear" and the defendant's conduct in leading the police to the body. The meaning of defendant's statement is, at best, ambiguous, and in our judgment, can in no way be said to constitute a knowing and intelligent waiver. Neither did the defendant's conduct in our view constitute a waiver. If every instance of incriminating conduct necessarily constituted a waiver of the right against self-incrimination, the result would be anomalous indeed and the right a hollow formality. The voluntariness of the conduct and the accompanying statement does not assuage their inadmissibility as evidence so long as a situation of custodial interrogation exists. *Michigan* v. *Mosely,* 423 U.S. 96, 99–100 (1975).

On the facts before us, given the repeated expression by the defendant that he did not wish to proceed without legal advice, we are not persuaded that the defendant's later decision in response to further questioning by the police to engage in incriminating conduct and make incriminating statements constituted a knowing and intelligent waiver. See *Id.* at 110, n.2 (White, J., concurring in result). The fact that the police made no effort to ascertain in a straightforward manner

whether the defendant wished to waive his right serves only to enhance our skepticism. See *Brewer* v. *Williams*, 430 U.S. 387, 405 (1977). Therefore, we hold the court erred in failing to suppress all the defendant's statements made after the end of his recorded statement set forth in this opinion. The admission of these statements worked to the defendant's substantial prejudice by providing crucial evidence on the issues of malice and premeditation. We cannot hold that these statements, beyond a reasonable doubt, were without adverse effect, and, therefore, must reverse. *State* v. *Persuitti*, 133 Vt. 354, 358, 339 A.2d 750, 753 (1975), *following Chapman* v. *California*, 386 U.S. 18, 24 (1967).

 In view of our reversal in this case we need pass upon only one of the several claims of error based on prosecutorial comment, namely the frequent references to the defendant's absence from the courtroom during trial. We do so because this issue might recur on retrial. The relevancy of the references is not seriously disputed. In *In re Pray*, 133 Vt. 253, 257, 336 A.2d 174, 177 (1975), we held the defendant's deportment, demeanor and day-to-day behavior at the time of trial to be relevant to the jury's consideration of an insanity defense. Any reference to the defendant's absence is likewise relevant to explain the necessity for this line of testimony where as here the jury cannot observe the defendant for themselves.

Defendant's argument of impermissibility is based on V.R. Cr.P. 43 (b) (1) which allows a trial of a noncapital offense to proceed despite the voluntary absence of the defendant. It is defendant's contention that by allowing his absence the Rule confers upon him a right to be absent. Based on this characterization of the Rule, he then argues that to permit any comment on his absence is to permit an adverse inference to be drawn from the exercise of the right to be absent from trial, thereby improperly burdening the exercise of that right. The success of defendant's argument, as he concedes in his brief, depends upon the degree to which this situation is analogous to the one before the United States Supreme Court in *Griffin* v. *California*, 380 U.S. 609, 615 (1965). There the Court determined that prosecutorial comment on a defendant's failure to testify impermissibly penalized that defendant's

constitutional right under the Fifth Amendment not to incriminate himself.

The analogy in our opinion between *Griffin* and this case is improperly drawn and defendant's argument therefore fails. It is by no means clear to us that V.R.Cr.P. 43 (b) (1) confers a right to be absent. The purpose of the Rule is no more than the protection of a criminal defendant's right to be present at his trial, and the prevention of the obstruction of that trial if the defendant absconds. 3 Wright, Federal Practice and Procedure: Criminal § 721, at 192, and § 723, at 200 (1969). Even if there were such a right, the defendant nowhere argues that it is of constitutional dimension. The rationale of *Griffin* pertains to the protection of constitutional rights and is therefore unavailable to the defendant.

The defendant has also advanced further claims of error relating to improper prosecutorial comment, the court's instructions to the jury, and its failure to charge as requested. We do not reach these claims as they are unnecessary to our decision. Moreover, these claims either were not properly saved for review and therefore waived, or are not likely to recur on the evidence presented at a new trial.

*Reversed and remanded.*