2010 VT 88

# State of Vermont v. William D. Muntean

[12 A.3d 518]

No. 09-241

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 5, 2010

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellant.

*Andrew M. Carter* of *Meub Gallivan Carter & Larson, P.C.*, Rutland, for Defendant-Appellee.

¶ 1. **Dooley, J.** This case presents the issue of whether defendant William D. Muntean was in police custody at any point during a police interview during which he made various incriminating statements. The trial court concluded that defendant was in police custody during the entire interview and that, because defendant had not received *Miranda* warnings before or at any point during the interview, the incriminating statements must be suppressed. The State filed an interlocutory appeal contesting the trial court's decision. We granted the appeal and affirm.

¶ 2. Defendant is charged with two counts of aggravated sexual assault pursuant to 13 V.S.A. § 3253(a)(9). During the course of discovery, defendant filed a motion to suppress statements that he made during a January 3, 2009 interview with the state police. Defendant alleged that the interview was custodial and that the interrogating detective failed to administer *Miranda* warnings before obtaining the incriminating statements. After holding a hearing, the trial court found the following facts.

¶ 3. In December 2007, the Vermont State Police opened an investigation of allegations that defendant had sexually abused his daughters when they were children and that he had more recently sexually molested his two grandsons. The investigating detective interviewed both defendant's adult daughters, who disclosed to him that defendant had sexually abused them when they were children, and his minor grandsons, who stated that defendant had engaged in recent acts of sexual abuse against them. On January 2, 2008, the detective telephoned defendant and told him that he would like to speak with him at the Rutland state police barracks on the following day. The detective did not mention to defendant what he wanted to talk about. Defendant agreed to the interview, which was arranged at a time that accommodated defendant's schedule.

¶ 4. The next day, defendant arrived at the barracks for the interview. Police cruisers were parked in the rear of the building, but visible to defendant as he drove into the barracks' parking lot. Upon arriving, he entered the lobby through the public entrance and waited there for the detective. The detective entered the lobby and invited defendant to accompany him to a part of the barracks that has controlled access. Defendant agreed, and the detective escorted him into the secured part of the building. The detective wore plain clothes and a badge on his belt and did not have a gun on his person.

¶ 5. The detective escorted defendant down a hallway approximately forty to fifty feet in length to the polygraph room, a small, windowless room located off the main hallway. When they entered the polygraph room, the detective instructed defendant to sit in the polygraph chair and asked if he would mind if the detective closed the door. Defendant did not object. The detective closed the door, which was located behind defendant and to his left, and then sat across a small table from him. The detective did not block defendant's access to the door.

¶ 6. After asking a few preliminary questions, the detective told defendant that he had spoken to defendant's daughters and that an allegation had been made. He asked defendant if he had an idea of the nature of the allegation. Defendant indicated that he did, but when asked if he could tell the detective what the allegation was, defendant said "no." Defendant then stated, "I need a lawyer to co-sign. I can't tell you." The detective responded, "Okay. That's fine. I mean it's up to you." However, the detective did not stop the interview.

¶ 7. Defendant asked the detective to disclose the allegations that had been made against him. The detective told him that they involved inappropriate touching and that he wanted to obtain defendant's side of the story. Upon hearing this, defendant stated, "Yeah, excuse me, I understand, you know, I mean I watch TV — you're not supposed to say anything without a lawyer." The detective responded, "It's your [choice]," and said that defendant was not under arrest and that no charges were pending against him. When defendant asked for confirmation that he was not under arrest, the detective replied, "No, no, you came here. I asked you to come. You're here on your own free will." Defendant indicated that he understood.

¶ 8. The detective then told defendant that he had recently interviewed defendant's minor grandsons as well. Defendant acknowledged an awareness of the interview with his grandchildren but denied that anything had happened with them. The detective then said:

> Bill, I talked to the boys. I mean, I know it's true and I understand — I understand certain things that happen to people, and I understand that there are things in life that sometimes you can't control. Okay? And I'm not trying to judge. I'm just trying to help you through that.

A short time later, the detective stated, "But, I mean, this is what we have right in front of us right now, and the allegations have been made, and I mean you've done it." Defendant again denied having engaged in improper acts with his grandsons, to which the detective replied:

> No, but I know you did. I mean, I've got four different people, plus I can see you. I can see the look in your face. I can see everything you're thinking right now, and

I know that you did, okay? The question is how do I help you past that, you know?

¶ 9. At this point, the detective confronted defendant with more details concerning the allegations that he had inappropriately touched his daughters and asked defendant to admit responsibility. Instead of admitting to any inappropriate activity, defendant replied: "You haven't given me my rights yet. Do I need rights now? What is said against me, you know?" The detective confirmed, "everything you say we're going to be using, yes." Defendant responded, "aren't you supposed to tell me that first?" The detective answered:

> You're not under arrest . . . . We're trying to do an interview here. You're going home today, okay? That's certain, all right. What happens after that — that's not for certain. But the question is, do you try to just shoot for it with the court, or do you try to explain yourself.

¶ 10. Shortly after this statement, there was a disruption in the hallway, prompting the detective to briefly step outside the polygraph room to quiet the noise. When the detective reentered, defendant proclaimed, "Like I said, I don't know what I should tell you without a lawyer." The detective explained to defendant that, "that's up to you," and that the detective could not advise him as to what he should say without a lawyer. Defendant then directly asked if he needed a lawyer. The detective again told him, "I can't advise you yes or no. I'm not allowed to say. You're here on your own volition, which is fine, and I appreciate you coming in. You've already admitted to some things that you did." Before this time, defendant had admitted that he had "touched" his daughters, but not to any specific acts. He steadfastly denied any inappropriate conduct with his grandchildren and claimed he felt judged by the detective.

¶ 11. The interview continued, and defendant admitted to certain specific acts of inappropriate conduct with his daughters, but denied others. The detective responded, "Gee, that's not completely true either." The detective then shifted back to the allegations made by defendant's grandchildren. When confronted with additional evidence provided by his grandchildren, defendant again mentioned an attorney, stating, "I guess I don't need a lawyer," and adding that he did not have the money for one. The detective replied, "I mean, that's all up to you." In response to an

inquiry about having counsel if he went to court, the detective told defendant, "The State can provide that for you."

¶ 12. As the interview proceeded, defendant's statements regarding the scope of his conduct with his daughters remained consistent, and he continued to deny ever inappropriately touching his grandsons. When the detective again asserted, "I know you did [inappropriately touch your grandsons]," defendant stated, "You know I did. I know you got me. Just, I hope you're not on my jury" and reasserted his belief that the detective was judging him. The detective agreed, "Yeah, well, because I talked to the boys." After even further pressing, and further denial by defendant, the detective added, "I can see the look in your face, and I can see the guilt in your face, or the shame, or all this, and I know it's hard to talk about the boys."

¶ 13. At the interview's conclusion, the detective cited defendant to appear in court to face charges of aggravated sexual assault on a minor. After receiving the citation, defendant submitted to the taking of fingerprints and photographs. He then left the barracks.

¶ 14. The detective did not raise his voice during the course of the interview. Furthermore, he remained seated except for the brief interval when he went to the door to address the disturbance in the hallway and, at the end of the interview, a period of time when he left the room to check on the availability of a polygraph test that defendant had indicated a willingness to take. During this period, defendant was left alone in the room. At no time before or during the interview did the detective advise defendant of his *Miranda* rights. Similarly, at no time during the interview did the detective inform defendant that he was free to leave whenever he wished. And at no time during the interview did defendant request to cease the interview, to leave the room, or to contact any other person. In total, the interview lasted for approximately one hour.

¶ 15. The trial court granted defendant's motion to suppress, concluding that the totality of the circumstances indicated that defendant was in police custody during the interview and therefore the detective's failure to administer *Miranda* warnings rendered inadmissible the statements defendant made. In particular, the trial court focused on the fact that the detective failed to tell defendant that he was free to terminate the interview or leave at any time, that defendant was immediately confronted with evidence suggesting he committed a serious crime, and that defend-

ant was told that the detective "knew" he had committed the crimes. The court found that all of these factors, when combined with the physical setting of the interview — a small, windowless polygraph room within a secured area in the police barracks — suggested that defendant was in police custody for the duration of the interview. The State filed an interlocutory appeal to this Court.

¶ 16. The State contends that the interview at the state police barracks was not custodial, or that at the very least only part of the interview was custodial, and that the trial court therefore improperly suppressed all of defendant's statements from the interview. As the State's argument is premised on *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny, our decision is governed by federal law. We must therefore "pay careful attention to the decisions of the United States Supreme Court when determining what constitutes custodial interrogation," *State v. Willis*, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985), for with respect to federal issues, "we are no more than an intermediate court, attempting to apply the supreme law of the land, as pronounced by [that Court]." *State v. Badger*, 141 Vt. 430, 448, 450 A.2d 336, 346 (1982) (quotation and citation omitted).

¶ 17. In *Miranda*, the United States Supreme Court established a framework for protecting an individual's federal privilege against compelled testimony, see U.S. Const. amend. V, in the context of police interrogation. The *Miranda* Court was concerned that "the compulsion inherent in custodial surroundings" might lead to involuntary confessions and thus created a rule to prevent the introduction of such confessions in a criminal trial. 384 U.S. at 458, 478-79; see *Montejo v. Louisiana*, 556 U.S. 778, 795, 129 S. Ct. 2079, 2090 (2009). Specifically, the Court held that the police must issue certain warnings whenever a suspect "is taken into [police] custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Miranda*, 384 U.S. at 478. These *Miranda* warnings are intended to counter the inherently compelling pressures attendant when the police have so restricted a suspect's freedom as to render him in police custody. *Id.* at 467. Any statements made during a custodial interview before the recitation of *Miranda* rights generally cannot be admitted as evidence in a criminal trial. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).

■ ¶ 18. Since *Miranda*, the United States Supreme Court has provided guidance for determining when a suspect is in police custody. Interrogation in certain custodial situations is "inherently coercive," *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) (quotation omitted), and custodial situations are created by either formal arrest or some other similar restraint on freedom to move. *Oregon v. Mathiason*, 429 U.S. 492, 494-95 (1977) (per curiam); *State v. LeClaire*, 2003 VT 4, ¶ 16, 175 Vt. 52, 819 A.2d 719. In determining whether a suspect is in police custody, a court must consider the "objective circumstances of the interrogation," *Stansbury v. California*, 511 U.S. 318, 323 (1994); *State v. Garbutt*, 173 Vt. 277, 282, 790 A.2d 444, 448 (2001), and decide whether they suggest a "restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation omitted); *State v. Pontbriand*, 2005 VT 20, ¶ 11, 178 Vt. 120, 878 A.2d 227 (quotation omitted). The ultimate inquiry is "how a reasonable person in [the suspect's] position would perceive his or her freedom to leave." *Stansbury*, 511 U.S. at 325. Consistent with the decisions from the United States Supreme Court, this Court has issued numerous decisions defining custody for *Miranda* purposes. See, e.g., *State v. Oney*, 2009 VT 116, 187 Vt. 56, 989 A.2d 995; *Pontbriand*, 2005 VT 20; *State v. Brunell*, 150 Vt. 388, 554 A.2d 242 (1988); *Willis*, 145 Vt. 459, 494 A.2d 108; *State v. Hohman*, 136 Vt. 341, 392 A.2d 935 (1978), *partially abandoned as recognized in Willis*, 145 Vt. at 474-75, 494 A.2d at 116; *State v. Howe*, 136 Vt. 53, 386 A.2d 1125 (1978).

■ ■ ¶ 19. The United States Supreme Court has noted some of the factors that may properly be considered in making the custody determination. The location of the police interview may be considered, but by itself is not determinative to the inquiry. See *Beheler*, 463 U.S. at 1125. In addition, a police officer's beliefs regarding a suspect's guilt — provided that they are communicated to the suspect — may be a part of the analysis "to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Stansbury*, 511 U.S. at 325 (quotation omitted). The "weight and pertinence" that should be afforded to such evidence depend on the facts of each particular case. *Id.* Furthermore, whether a suspect arrives at the interview voluntarily and whether he or she leaves by his or her own free will may be taken into account. *Mathiason*, 429 U.S. at 495. Other

courts have considered additional factors, such as whether the police told the suspect that he was free to terminate the interview at any point and leave; the extent to which the suspect was confronted with evidence of guilt; whether and to what degree the suspect's freedom of movement was restrained; whether the police used deceptive techniques in conducting the interview; the degree to which the suspect was isolated from the outside world; the duration of the interview; whether the police officers were armed; and the number of police officers present during the interview. See, e.g., *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008) (considering four factors relevant to that particular case for purpose of determining whether police interview was custodial); *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002) (listing six nonexhaustive indicia of police custody); *United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001) (reciting various objective circumstances relevant to custody inquiry). There is no exhaustive list of criteria that can be considered in making the custody determination, nor is there one particular factor that must be considered in every case. Rather, the court must assess the totality of the relevant circumstances and conclude, given those circumstances, whether a reasonable person would have felt free to terminate the interview and leave. See *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); accord *Willis*, 145 Vt. at 475, 494 A.2d at 117.

■ ¶ 20. Our review of the trial court's custody determination is thus twofold. First, we must review the trial court's findings of fact as to the circumstances of the interview. *Thompson*, 516 U.S. at 112; *Pontbriand*, 2005 VT 20, ¶ 12. We will accept such findings unless they are clearly erroneous. *Thompson*, 516 U.S. at 112; *Pontbriand*, 2005 VT 20, ¶ 12. Second, given the circumstances surrounding the interrogation, we must consider whether a reasonable person would have felt at liberty to terminate the interview and leave. *Thompson*, 516 U.S. at 112; *Pontbriand*, 2005 VT 20, ¶ 12. This latter inquiry is a mixed question of law and fact that we review de novo. *Thompson*, 516 U.S. at 112; *Pontbriand*, 2005 VT 20, ¶ 12.

¶ 21. In concluding that defendant was in police custody throughout the interview at the police barracks, the trial court focused primarily on the following uncontested findings of fact: (1) the detective at no point told defendant that he was free to leave at any time; (2) defendant was immediately confronted with

evidence of guilt of a serious crime; (3) the detective indicated to defendant that he was certain of defendant's guilt; and (4) the interview took place in a small, windowless polygraph room located in the secured part of the police barracks. The trial court also considered a number of factors weighing against a custody determination, most importantly the fact that defendant arrived at the police barracks voluntarily, that the detective acknowledged that defendant was there voluntarily, and that defendant's freedom to move about the room was not restricted, nor was he "directly" denied access to contact any other person or to leave the room. We conclude that these findings are not clearly erroneous, and thus we are bound by them. See *Oney*, 2009 VT 116, ¶ 13.

■ ¶ 22. After considering the trial court's findings of fact, we conclude that the court correctly determined that defendant was in police custody for the duration of the interview. The totality of the relevant objective circumstances in the case indicates that a reasonable person would not have felt at liberty to terminate the interview and leave.

■ ¶ 23. First, the physical setting of the interview supports a finding of police custody. See *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) (citing fact that defendant was interviewed at police station as a circumstance "weigh[ing] in favor of the view that [defendant] was in custody"); *State v. Lacey*, 2009 MT 62, ¶ 63, 204 P.3d 1192 (fact that interview occurred at police station "undoubtedly weighs in favor of a custodial interrogation"); *State v. Rogers*, 760 N.W.2d 35, 54 (Neb. 2009) (listing location of interrogation among "circumstances . . . most relevant to the custody inquiry"). As previously noted, the fact that a defendant is interrogated in a police station is never by itself sufficient to warrant a finding of police custody. See, e.g., *Mathiason*, 429 U.S. at 495 (noting that interview at police station did not by itself render suspect in police custody); *Oney*, 2009 VT 116, ¶ 16 ("Custody is not established simply because the questioning takes place in a police station."). The location of the interview and the nature of the physical setting where the interview occurred are persuasive factors in the custody calculus, however, for they directly relate to the question of whether a reasonable person would have felt at liberty to terminate the interview and leave. See *Yarborough*, 541 U.S. at 665 (fact that interview held at police station makes finding of custody more likely); *Butler*, 249 F.3d at

1099 (noting importance of physical characteristics of place where interview occurs in making custody determination); *State v. Evans*, 582 S.E.2d 407, 410 (S.C. 2003) (affirming trial court's custody analysis that partially relied on fact that interview was conducted in back office of police station).

¶ 24. Here, although defendant arrived at the police barracks voluntarily, once he arrived, he was escorted to a secure part of the building by the detective. See *Rogers*, 760 N.W.2d at 61 (noting that defendant was taken to secure area of police station for questioning). He was led to a small, windowless room, which he was told was a "polygraph room." Defendant was instructed to sit in the polygraph chair. See *id.* (emphasizing fact that defendant was escorted to polygraph room and sat in examination chair for more than two hours while questioned). The detective closed the door, albeit with defendant's permission, physically isolating the two of them from the rest of the station. See *State v. Dailey*, 273 S.W.3d 94, 103 (Tenn. 2009) (noting that defendant's "movements were restrained to the extent that he was placed in the back corner of a small room with one door, [and] the door was closed"); *Pontbriand*, 2005 VT 20, ¶ 12 (distinguishing case from previous case in part on ground that door was open); cf. *State v. Bridges*, 2003 ME 103, ¶ 33, 829 A.2d 247 (noting defendant interviewed in bedroom in fire station which "was hidden from public view [and] served to isolate [her] from the outside world"). It is true that defendant was not physically restrained and could have moved about the room, and theoretically could even have attempted to walk out the door and leave. It is unlikely that a reasonable person would have felt at liberty to do so, however, for "[b]eing physically capable of getting out of a room is not the same as being given permission to walk out of a station full of police officers and simply go home." *Rogers*, 760 N.W.2d at 57. This is particularly true in the instant case, where defendant was in a secure part of the building and therefore would not have been permitted to walk outside the room freely without police accompaniment. Cf. *Commonwealth v. Groome*, 755 N.E.2d 1224, 1229-30, 1236 (Mass. 2001) (noting that defendant was able to make several unaccompanied trips to restroom and concluding that he was not in police custody prior to issuance of *Miranda* warnings).

¶ 25. Compounding the coercive nature of the physical setting is the fact that the detective did not tell defendant that he

was free to leave whenever he so desired. Numerous courts have held that such disclosure is significant in determining whether a reasonable person would have felt at liberty to terminate a police interview. See, e.g., *United States v. Chee*, 514 F.3d 1106, 1114 (10th Cir. 2008) (finding defendant not in police custody, in part because he was told he was free to leave); *Burket v. Angelone*, 208 F.3d 172, 197 (4th Cir. 2000) (emphasizing that defendant was told he was not under arrest and was "free to leave at any time"); *Rigterink v. State*, 2 So. 3d 221, 253 (Fla. 2009) (noting that appellate court "is far less likely to find that a reasonable person would have believed that he or she was in custody if the police specifically informed him or her that the interview was strictly voluntary and that he or she was — and continually remained — free to leave at any time"), *rev'd on other grounds by Florida v. Rigterink*, ___ U.S. ___, 130 S. Ct. 1235 (2010) (mem.) (reversing and remanding case to state supreme court based on adequacy of *Miranda* warning). Although defendant was told that he would leave "today" and was reminded that he had come to the police barracks voluntarily, such communications stop short of indicating that defendant could leave at any time. For instance, leaving "today" could mean that defendant would be released in twelve hours. Similarly, the fact that one goes to the police station voluntarily does not necessarily mean that he or she can also *leave* voluntarily, for "at some point the words and conduct of the interrogating officers may transform that which once was a noncustodial, 'voluntary' event into a custodial interrogation." *Rigterink*, 2 So. 3d at 244.

¶ 26. The foregoing point was emphasized in *State v. Brunell*, 150 Vt. 388, 554 A.2d 242, a case in which the defendant was invited to the police station, but told that he did not have to go and that he was not under arrest or in custody. The facts showed, however, that if the defendant went, he had to go that night, and once he reached the police station he was subjected to a lengthy interrogation in a small office without others being present.[1] We affirmed the trial court's conclusion that under those circumstances a reasonable person would not feel free to refuse to

---

[1] The dissent seeks to distinguish *Brunell* by emphasizing the facts that support its conclusion and ignoring the facts that do not. *Post*, ¶ 40. If, as the dissent states, the facts were that the defendant was told that he "had to go to the police station that night," *Brunell* represents a routine application of settled law. *Id*. But as Justice Peck emphasized in dissent, the facts were:

submit to questioning and, therefore, that the defendant was in custody for *Miranda* purposes. *Id.* at 392, 554 A.2d at 244. This distinction was also emphasized in *State v. Hohman,* 136 Vt. 341, 392 A.2d 935, a case in which the defendant flagged down a police cruiser and asked to go to the police station to confess to a crime. In relation to the interrogation at the police station, we emphasized that "[t]he proper question is not whether the defendant appeared of his own free will, but whether he reasonably believed he was free to leave." *Id.* at 350, 392 A.2d at 941.[2]

---

["One of the officers] told defendant and his wife that they did not have to come to the police station, but if they did come he would bring them back home after the interview at the police station."

The police repeatedly assured defendant, both at his parents' home and later at the barracks, that his presence, and any answers he might choose to give in response to questions, was purely voluntary, that he could terminate the interview at any time he wished, and thereafter would be returned to his home, as in fact he was, regardless of his admissions, and that he was not under arrest.

*Brunell,* 150 Vt. at 395, 554 A.2d at 246 (Peck, J., dissenting) (quoting trial court findings). Nevertheless, one of the officers told defendant's mother that the defendant had to go with the officers then. The majority reconciled the evidence as stated in the text above. Justice Peck characterized the claim that this officer's statement modified the general police assertion that the defendant was not free to go to the station as "a play on the words allegedly employed by the officer in a spontaneous utterance, as though the speaker should know his statement would be literalized and isolated in a vacuum." *Id.* at 397, 554 A.2d at 247.

Today's dissent apparently would also distinguish *Brunell* because the officers in *Brunell* specified when the defendant had to go to the police station, if he chose to do so. We view this as a minor factual difference from the case before us. A police witness testified in *Brunell* that he specified a time because "he wanted the statement while the events were still fresh in their minds." *Id.* at 389, 554 A.2d at 243. In any investigation, time may be of the essence, and police officers are not available at all times to conduct interviews. If the timing were inconvenient to the defendant, he could have refused to go to the police station at all.

[2] The dissent has nitpicked at *Hohman* in an unsuccessful attempt to distinguish it. *Post,* ¶ 41. The distinction for which the case is cited is between appearing voluntarily at a police station for an interview and believing one is free to leave after the interview commences. As stated in *Hohman,* and the case cited by the dissent, *Willis,* 145 Vt. 459, 494 A.2d 108, the latter issue is judged by an objective standard: whether a reasonable person would feel free to terminate the interview and leave the police station. In *Willis,* this Court found the description of the objective standard in *Hohman* to be confusing; that is, it found that the language used — whether defendant "could reasonably have believed he was not free to leave" — to be close enough to a subjective standard to be confused with it and

¶ 27. The fact that the detective did not expressly tell defendant that he was free to terminate the interview partially distinguishes this case from *State v. Oney*, 2009 VT 116, another police custody case recently decided by this Court. In *Oney*, the defendant voluntarily accompanied a police officer to the police station to be interviewed about a series of fires that had recently been set in the area. After arriving at the station, the defendant — without having received *Miranda* warnings — spoke with two police officers in an interview room and admitted to setting three fires. In affirming the trial court's conclusion that the defendant was not in police custody when he made these incriminating statements, we emphasized the trial court's finding that "the police officers made it very clear that [the defendant] was free to leave at any time." *Id.* ¶ 16 (quotations omitted). Here, by contrast, the detective never expressly indicated that defendant was free to terminate the interview and leave at will.

¶ 28. The detective's conduct toward defendant during the interview also supports a conclusion that defendant was in police custody. As the trial court noted, defendant was confronted "almost immediately, and continuing throughout the interrogation" with evidence of guilt of a serious crime. See *Butler*, 249 F.3d at 1099 (listing "extent to which the [defendant] was confronted with evidence of guilt" among factors indicating custody). Near the start of the interview, the detective indicated that defendant's daughters and grandsons had independently alleged that defendant had sexually abused them. A reasonable person would not feel at liberty to terminate a police interview after being confronted with such evidence, as a "reasonable person understands that the police ordinarily will not set free a suspect when there is evidence strongly suggesting that the person is guilty of a serious crime." *State v. Pitts*, 936 So. 2d 1111, 1128 (Fla. Dist. Ct. App. 2006) (quotations omitted); accord *People v. Minjarez*, 81 P.3d 348, 356 (Colo. 2003) (fact that interrogating officer confronted defendant with evidence against him is relevant to custody totality test). In *Hohman*, we observed that "where there is probable cause it is presumed that the police will do their job and arrest." 136 Vt. at

directed that this language not be used in the future. *Id.* at 474-75, 494 A.2d at 116 (quotation omitted). This criticism of the language of *Hohman* has nothing to do with the distinction the case drew that is controlling in this case or with the validity of the decision.

350, 392 A.2d at 940-41. Here, defendant's admission provided probable cause to arrest, and the detective insisted throughout the interview that he "knew" that defendant was guilty. See *Minjarez*, 81 P.3d at 356 (noting interrogating officer's expressed belief that defendant was guilty); *Rigterink*, 2 So. 3d at 250-51 (highlighting fact that interview included repeated accusations of lying); *Bridges*, 2003 ME 103, ¶ 28 (recounting officers' repeated accusations of lying by defendant and suggestions that defendant was guilty). Such "prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993). While the subjective beliefs of the police are irrelevant by themselves, they may become relevant when they are communicated to the defendant and affect an objective determination of whether the defendant would feel free to leave. See *Garbutt*, 173 Vt. at 282, 790 A.2d at 448.

¶ 29. The fact that during the interview defendant was accused of committing a. serious crime and confronted with evidence of his guilt relating to a serious crime again distinguishes this case from *Oney*. In *Oney*, the officers represented to the defendant that the crimes under investigation were all misdemeanors, although defendant was ultimately charged with two misdemeanors and one felony. We emphasized that for "misdemeanors committed not in the presence of an officer, typically the police issue only a citation and do not arrest the suspect." *Oney*, 2009 VT 116, ¶ 15. Thus, a reasonable person in the defendant's situation in *Oney* would not expect to be arrested and detained by the police at the end of the interview. Here, defendant was questioned about felonious conduct: the sexual abuse of his two minor grandsons and two of his daughters when they were children. Therefore, unlike in *Oney*, a reasonable person in defendant's shoes — after having been confronted with evidence of guilt for a serious crime and told by the detective that he was convinced of defendant's guilt — would not have felt as though he remained free to leave. See *Rigterink*, 2 So. 3d at 252 (concluding that reasonable person would not feel at liberty to leave after being confronted with fingerprint evidence relating to a murder). This is particularly true where, as here, the defendant has

confessed to at least some of the allegations made against him.[3] See *Oney*, 2009 VT 116, ¶ 14 ("We acknowledge that once a suspect confesses to committing a serious criminal act, this fact is significant in this evaluation. However, the severity of the crime confessed to affects the weight we attribute to this factor." (citation omitted)).

¶ 30. The State, in arguing that defendant was not in police custody during the interview, primarily relies on *State v. Pontbriand*, 2005 VT 20. In that case, two law enforcement officers interviewed the defendant while he was in a hospital bed about an alleged sexual assault on his girlfriend's daughter. The officers had with them a copy of an email the defendant sent to the girlfriend in which he admitted to an inappropriate sexual relationship with the daughter. They said that they knew what happened and could not promise not to arrest him. We held that "[t]hese actions did not . . . constitute evidence so overwhelming that a reasonable person in [the defendant]'s position would believe that he or she was no longer free to end the conversation." *Pontbriand*, 2005 VT 20, ¶ 18.

¶ 31. *Pontbriand* can be distinguished from the instant case. We would agree that here, under *Pontbriand*, the fact that the detective told defendant that the detective believed the daughters and grandsons — and not defendant — would not alone establish custody. Here, however, it is only one factor pointing to the presence of custodial interrogation, and the totality of the objective circumstances surrounding the interview indicates that defendant was in police custody for the entire interview. Specifically, the physical setting of the interview, when combined with the fact that defendant was not told that he could choose to leave whenever he so desired, was immediately confronted with evidence implicating him in a serious crime, and was told repeatedly that the detective "knew" that he was guilty of the crime, strongly

---

[3] The dissent claims that defendant "only admitted that he had 'touched' his daughters" and, therefore, did not confess to a crime. *Post*, ¶ 43. Apparently, the dissent believes that the term "touched" is ambiguous and could have referred to parts of the body like the face or shoulder. The trial court's finding on the point was that "while defendant denied touching his daughters' vaginas (except for one time with his daughter Andrea) he admitted touching their breasts." We recognize that although these admissions were more limited than the daughters' accusations — that defendant inserted his fingers into their vaginas and had intercourse with them — they still constitute confessions to serious crimes. Defendant did not admit to only innocuous, noncriminal touching.

suggests that a reasonable person in defendant's shoes would not have felt free to terminate the interview and walk away. While we caution that every case must be analyzed on its individual facts and circumstances, and precedents must be viewed in that light, we observe that the circumstances of this case make it closer to those in *Brunell* and *Hohman,* where we found custody, than to *Oney* and *Pontbriand,* where we did not.

¶ 32. In summary, we find that because defendant's freedom of movement was curtailed to the degree of formal arrest for effectively the entire interview, see *Berkemer v. McCarty,* 468 U.S. 420, 440 (1984), and a reasonable person in defendant's situation would not have felt free to discontinue the questioning, the detective was obligated to recite *Miranda* warnings before starting the interview. As he failed to do so, the trial court correctly suppressed defendant's statements.

*Affirmed.*

¶ 33. **Reiber, C.J.,** dissenting. The issue before the Court today is whether defendant was "in custody" within the meaning of the Fifth Amendment during an interview with police in which he made incriminating statements. The majority holds that defendant was in custody at the time he made the statements at issue. If defendant was in fact in custody, the Fifth Amendment requires these statements be suppressed at trial because defendant had not been read his *Miranda* warnings. Because the present case is, in my opinion, factually indistinguishable from *State v. Oney,* 2009 VT 116, 187 Vt. 56, 989 A.2d 995, which lays out the scope of "in custody" under our current jurisprudence, I respectfully dissent.

¶ 34. In determining whether the detective in this case violated defendant's Fifth Amendment rights, the central question is whether the defendant was in custody at the time of the confession. *Id.* ¶ 10. Defendant does not claim the trial court's findings of fact are erroneous. Thus, the sole issue concerns the trial court's ultimate legal conclusion, that the totality of the circumstances would have led a reasonable person to believe that he or she was in custody. This legal conclusion is reviewed de novo. *State v. Pontbriand,* 2005 VT 20, ¶ 12, 178 Vt. 120, 878 A.2d 227.

¶ 35. Our decision in *Oney* explicitly delineates what it means to be "in custody" as it applies to *Miranda* warnings, but was decided five months after the trial court's decision here on appeal.

In *Oney*, this Court upheld the trial court's ruling that the defendant was not in custody at the time he made incriminating statements, and therefore, any incriminating statements were admissible. The facts there were not disputed: a police officer approached the defendant at a convenience store and asked about three fires that had been set that evening; the officer asked the defendant if he would go to the police department to talk, and he agreed to do so. The officer put defendant's bicycle in the police car and drove the defendant to the station with defendant sitting in the front seat. After entering the station, the defendant sat, unrestrained, in an unlocked interview room. The defendant was interviewed by two officers, who said that he was there of his own free will, and he could go at any time. The defendant admitted to setting the three fires that evening after which he said, "I still think I should have a lawyer here." *Oney*, 2009 VT 116, ¶ 4. No answer was given, but in our decision we noted that the defendant never directly requested a lawyer. *Id.* ¶ 4. Subsequently, the officers said they had surveillance tapes of three other fires, and defendant confessed to them as well. Near the end of the interview, the defendant stated that he wanted to leave, but one of the officers said, "We're not done yet," and prevented his departure. *Id.* The defendant was eventually cited and then permitted to depart.

¶ 36. On appeal, the defendant in *Oney* argued that after he confessed to setting the first three fires, if not sooner, he was in custody, and as he was never given any *Miranda* warnings, the confessions were inadmissible. He argued that he was deprived of his freedom of action because "a reasonable person in a small, windowless room at the police station, after having confessed to three crimes, would not believe that he was free to leave, despite the officer's statements to the contrary." *Id.* ¶ 12. We held otherwise.

¶ 37. We stated that "[a] noncustodial situation does not become custodial automatically because the interviewee has confessed to a crime." *Id.* ¶ 14. We therefore held that the bare fact that the defendant had confessed to what he thought were three misdemeanors "would not necessarily lead a reasonable person in defendant's circumstances to believe that he was not free to leave." *Id.* ¶ 15. We ultimately concluded the defendant was not in custody because the police officers repeatedly told him that he was free to leave, the questioning was not coercive, he was

unrestrained, and he had access to an unlocked door. *Id.* ¶ 16. As we observed, the defendant in *Oney* was not deprived of his freedom of action "in a significant way." *Id.* (quotation marks omitted).

¶ 38. In the case we consider today, it is difficult to see how the trial court here would have arrived at the same conclusion had the *Oney* decision already issued. It appears that within four minutes of starting the interview defendant admitted touching two of his adult daughters when they were children. The majority attempts to distinguish *Oney* from the present case on two grounds: (1) the detective here never explicitly told defendant he was free to terminate the interview; and (2) defendant was accused of committing a "serious crime." *Ante*, ¶¶ 27, 29. Neither is persuasive.

¶ 39. As the majority notes, the detective here told defendant that he was not under arrest, that he was going to go home that day, and that he was there of his own free will. Because the detective never explicitly told defendant he could leave anytime, however, the majority concludes that *Oney* is distinguishable. This is form over substance. The detective's statements effectively informed defendant he was free to leave. Although the detective did not explicitly say, "you are free to leave at any time," this is a distinction without a difference. The detective's assurances, taken together, would have led a reasonable person in defendant's position to believe that he or she was free to terminate the interview and leave.

¶ 40. Furthermore, the two cases cited by the majority for the proposition that a voluntary interview may transform into a custodial interrogation are inapposite. See *State v. Brunell*, 150 Vt. 388, 554 A.2d 242 (1988); *State v. Hohman*, 136 Vt. 341, 392 A.2d 935 (1978), *partially abandoned as recognized by State v. Willis*, 145 Vt. 459, 494 A.2d 108 (1985). In *Brunell*, we concluded that the defendant was in custody because the defendant's mother was told, in his presence, that the defendant had to go to the police station that night. Further, the defendant was taken to the police station in a police cruiser during the late evening, his brother was not permitted to accompany him on the thirty-minute ride, and once at the station, the defendant was placed in a separate room where he was interrogated by two officers for a lengthy period of time. *Brunell*'s focus was on the "restriction placed upon defendant's freedom." 150 Vt. at 392, 554 A.2d at 244. Except for the small room, the present case is entirely distinguishable. Here,

defendant was not forced to come to the police station at any particular time, rather he was invited the day before; he was not taken to the station in a police cruiser, rather he drove down to the barracks in his own vehicle and at a time of his choosing; he was not interviewed by two police officers for a lengthy period, rather the interview was by only one officer and lasted approximately one hour.

¶ 41. The second case the majority relies upon is equally inapt. As the majority acknowledges, this Court has abrogated *Hohman* to the extent that the language implied that we look to the defendant's subjective state of mind with regard to whether he believed himself free to leave. *Willis*, 145 Vt. at 474-75, 494 A.2d at 116 (abandoning language in *Hohman* stating that this Court looks at "whether the defendant could reasonably have believed he was not free to leave" (quotation omitted)). Thus, it is from the perspective of the objective, the reasonable person, that we must assess defendant's state of mind. In *Hohman*, the defendant flagged down a police car in the middle of the night and proceeded to make spontaneous admissions about murdering a young girl the day before. The officer responded that the defendant should be quiet until he was read his rights, but at the station the defendant made another voluntary statement which tended to incriminate him. At the end of his statement the defendant said "End of statement." *Hohman*, 136 Vt. at 347, 392 A.2d at 939. However, the officers continued to question him. This Court concluded that a finding of custody was compelled when probable cause to arrest was accompanied by other facts which would lead a reasonable person to believe he was not free to leave; in *Hohman* those facts included being interrogated in an interrogation room while an officer filled out an arrest form. *Id.* at 350, 392 A.2d at 940-41. Any reasonable person would feel he was not free to leave if he saw a police officer filling out his arrest form. *Hohman* may stand for the proposition that it is "presumed that the police will . . . arrest" on probable cause, *id.*, but that presumption is obviously a rebuttable one. And that presumption is rebutted when the facts as known to the defendant point away from arrest. *Id.*

¶ 42. The majority also asserts that this case is distinguishable from *Oney* because defendant was accused of committing a "serious crime." We have recognized that "once a suspect confesses to committing a serious criminal act, this fact is significant

in this evaluation." *Oney*, 2009 VT 116, ¶ 14. The defendant in *Oney* confessed to setting six fires, which the police told him were misdemeanors (four of which were later charged as felonies), and we held that a "mere confession to what defendant believed to be three misdemeanors would not necessarily lead a reasonable person in defendant's circumstances to believe that he was not free to leave." *Id.* ¶ 15.[4] Here, defendant was accused of sexual abuse, and the majority assumes that a reasonable person in defendant's shoes would not feel free to leave if accused of committing such a "serious crime."

¶ 43. Notably, the majority conflates mere accusations with confessions. Defendant only admitted that he had "touched" his daughters and adamantly denied the allegations involving his grandchildren. Thus, the logic of *Oney*, that a defendant who has confessed to a crime would assume that he is not free to leave, does not apply. Moreover, there is little reason to believe that a reasonable person accused of sexual abuse would feel any less free to leave than a person accused of setting multiple fires.

¶ 44. The majority also makes much of the fact that defendant was interrogated at the police station in a "small, windowless polygraph room within a secured area in the police barracks." *Ante*, ¶¶ 15, 21, 24. As we stated in *Oney*, this in and of itself is meaningless. 2009 VT 116, ¶¶ 12, 16. It is the combination of factors that is important, see *id.*, and the United States Supreme Court has previously stated that being interviewed in a police station is not enough to make an interview custodial. See *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) ("[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."). Thus, the question is one of the degree of oppression a reasonable person would feel under the circumstances.

¶ 45. In *State v. Lancto*, 155 Vt. 168, 582 A.2d 448 (1990), the defendant was found on foot, near an accident scene, with a head injury. The defendant claimed the head injury was from a fight,

---

[4] The police officers told the defendant in *Oney* that setting the fires were misdemeanors. He confessed to setting six fires and was actually charged with two misdemeanors and four felonies.

and the trooper accused him of lying. The officer then directed the defendant to sit in the cruiser where he questioned the defendant. Statements made in this interrogation, along with the officer's observations, ultimately led to a charge of driving under the influence, and we found this situation to be noncustodial. *Id.* at 171, 582 A.2d at 450. The circumstances here are no more oppressive than the interrogation found to be noncustodial in *Lancto.* Here, defendant drove himself to the interview and was seated in a small room with the door closed, but not locked, and his access to the door was not blocked. The interview lasted only about one hour. Defendant was confronted with allegations of a crime, but it was by a plain-clothes officer with a badge and without a weapon, who told him that he was there of his own free will and that he was not under arrest.

¶ 46. The majority's opinion reflects an erosion of the limits on *Miranda* expressed in *Hohman* and *Brunell,* cases that were intended to curtail incommunicado interrogation in a police-dominated atmosphere amounting to formal arrest. Ultimately, this case is indistinguishable from *Oney* and compels the same result. The grounds on which the majority distinguishes those cases are unpersuasive. Accordingly, I respectfully dissent.

¶ 47. I am authorized to state that Justice Burgess joins this dissent.